State ex rel. Dudgeon v. Levitan, 181 Wis. 326.

STATE EX REL. DUDGEON, Relatrix, vs. LEVITAN, State Treasurer, Respondent.

*March 10—October 16, 1923.*

*Schools: Teachers' Retirement Act: Teachers who die while in service: Designated beneficiaries: Right to increased accumulations: Constitutional law: Public purpose: Due process: Equal protection of the laws.*

1. Under ch. 459, Laws of 1921 (the Teachers' Retirement Act), the designated beneficiary of a teacher who died while in actual service is entitled to recover the amount of the computation provided in sec. 42.51, Stats. 1921, in addition to the deposits, both individual and state, which have been paid into the deposit fund.
2. The state constitution being not a grant of but a limitation upon legislative power, the legislature may adopt any and all measures which in its judgment will promote the efficiency of the schools of the state, unless prohibited by some express constitutional provision.
3. A conclusion of the legislature that the establishment of a pension system for teachers would induce experienced and competent teachers to remain in the service and thereby promote the cause of education cannot be said by the court

State ex rel. Dudgeon v. Levitan, 181 Wis. 326.

to be unfounded, in view of the general opinion favoring such system, the conclusions reached by investigators on the subject, and the enactment of similar legislation in twenty-five other states. Such laws do not constitute an appropriation of public funds for a private purpose.

4. The provision of sec. 42.51, Stats. 1921, for addition to the pensions of teachers who had been in service more than twenty-five years before the enactment of that statute, based on a computation of what they would have received if the act had been in force during their period of service, is not a grant of extra compensation for services already rendered by the teachers, contrary to sec. 26, art. IV, Const., but was intended to induce experienced teachers to remain in the service, and therefore is compensation for the services to be rendered in the future, even though, in cases of teachers longest in service, such additional compensation would be disproportionate to the services thereafter rendered.

5. The Teachers' Retirement Act does not take the property of the teacher without due process of law, since it does not take any property from the teacher, but merely prescribes as a condition of the contract of employment that a portion of the compensation under the contract shall be paid into the retirement fund for the purposes stated in the act, and the teacher is at liberty to accept or reject the contract on those terms.

6. The Teachers' Retirement Act is not a police regulation, but is a law intended to promote the educational interests of the state relating to the conditions upon which the public will contract with those undertaking to teach in the schools; and there is no constitutional requirement that such contract shall operate uniformly throughout the state. But even if it is a police regulation there is basis for the classification, so the state could prescribe, as it did, one form of contract in Milwaukee county and another form in other counties, without rendering it unconstitutional as denying equal protection of the laws.

ESCHWEILER, J., dissents.

ORIGINAL JURISDICTION. This is a *mandamus* action wherein the original jurisdiction of this court is invoked to compel payment to relatrix of a certain warrant for a death benefit which she claims as the beneficiary of Richard B. Dudgeon, deceased, pursuant to the terms of the Teachers' Retirement Act.

Prior to his death Richard B. Dudgeon was engaged as a teacher in the public schools of the state of Wisconsin for a period of forty-six years. He was so engaged at the time of the enactment of ch. 459 of the Laws of 1921, known as the "Teachers' Retirement Act." At the time of his death he was a member of the teachers' retirement fund which was created by that act. Prior to his death he had duly designated the relatrix, who is his widow, as his beneficiary under that act. After the death of said Richard B. Dudgeon said relatrix filed with the annuity board, provided for by the terms of said retirement act, her election to take the death benefit payable to her as the beneficiary of Richard B. Dudgeon, deceased, in a single sum, as she was privileged to do under the terms of the act. Thereafter said annuity board computed and determined the amount due the relatrix as and for said death benefit to be the sum of $17,477.74, and passed said claim, accompanied by the certificate of said board, to the secretary of state for audit, in the manner provided by law; the secretary of state duly audited said claim at said sum, issued his warrant therefor, and delivered the same to the state treasurer for payment. The state treasurer refused to pay the same, claiming that under the terms of the law the relatrix was not entitled to certain accumulations computed upon the service of the deceased prior to the time of the enactment of the law, which said accumulations with interest amounted to $16,695.74.

An alternative writ of *mandamus* issued out of this court, addressed to the state treasurer, commanding him to pay the warrant issued by the secretary of state for the beneficiary's claim or to show cause for his failure so to do. The state treasurer moved to quash the alternative writ of *mandamus*.

For the relatrix there were briefs by *Olin, Butler, Thomas, Stebbins & Stroud* of Madison, attorneys, and *E. J. Dempsey* of Oshkosh, *B. F. Williams* of Milwaukee, and *R. I. Tipton* of Superior, of counsel; and the cause was

argued orally by *Mr. H. H. Thomas, Mr. Tipton,* and *Mr. Williams.*

The *Attorney General, Franklin E. Bump* and *J. E. Messerschmidt,* assistant attorneys general, and *William R. Curkeet* of Madison, special counsel, for the respondent.

The following opinion was filed April 20, 1923:

OWEN, J. Two questions are presented: (1) the proper construction of certain portions of the Teachers' Retirement Act; and (2) its constitutionality. An understanding of the spirit and purpose of this and similar laws will be helpful in solving both questions.

One of the major functions of all government is to promote an efficient educational system. For many years public attention has been drawn to the fact that our schools are not equipped with experienced teachers. Countless individuals enter the teaching profession during the early years of their lives only to drop out after a brief experience and enter more inviting and remunerative vocations. Although the state maintains teachers' training schools and normal schools for the purpose of qualifying teachers to render efficient service in the schools of the state, the brief tenure of service rendered by those who are thus educated is most discouraging, and the state fails to reap a proportionate benefit from the money thus expended. The reason is apparent. The teaching profession does not yield the remuneration afforded by other vocations requiring much less knowledge. It is briefly followed by many merely as a stepping-stone to acquire a little experience and to enable them to place themselves in some other business or profession. Thus the great number of our teachers are young and inexperienced. Those who have given serious thought to the problem agree that if those who have once entered the profession are to remain therein, the profession must yield a competence in old age. Even though the spirit of devotion and self-sacrifice to laudable and noble work be

State ex rel. Dudgeon v. Levitan, 181 Wis. 326.

deeply implanted in some, that instinct of human nature which enjoins us to make use of our years of strength and power to provide for the infirmities of age operates as a restraint upon their altruistic indulgences. A calling or profession will attract and hold men of intelligence, ability, and devotion only so long as they recognize that the avenue of promotion is open to them and that security is offered against the risks of life. A certain measure of economic independence should be the reward of one who labors loyally and successfully in a profession or other field of employment. The prevailing salaries of teachers have not been sufficient to accomplish this result. Because of the discouraging consequences resulting to our educational system from the brief tenure of service on the part of those whom the state has educated for the work, there has been and is a growing sentiment that the teaching profession must be made more attractive by rewards of a material nature to induce a longer tenure of service. As a phase of that broader social philosophy which has come to demand that an employee who has given the services of a lifetime to an employer be provided for in his old age, public thought has crystallized upon the idea that teachers who render society service of the highest order shall not wear themselves out and be summarily dismissed from the service without something in the nature of a provision for the support of themselves and their dependents. It is recognized that this protection should be more definite and dignified than that of common charity. This belief finds expression in so-called teachers' pension laws providing a fund created by the contributions of the teacher and the state. The result sought and hoped for is an encouragement of thrift on the part of the teacher and a more devoted, contented, and continuous service, thus benefiting both the teacher and the public.

In Bulletin No. 12 issued by the Carnegie Foundation for the advancement of teaching in 1918, we are told that

Belgium, France, Great Britain and Ireland, Italy, Greece, Russia, Holland, Denmark, and Sweden, Germany, Austria-Hungary, New Zealand, Japan, South America, and South Africa have had teachers' retirement systems for many years. In the United States, however, such systems have but a brief history. The first system for city school teachers was established in Chicago in 1893. At the time of the issuance of the bulletin there were twenty-one state pension systems, while four other states had general laws permitting local bodies to set up plans. Our first attempt along this line was in 1911 by the passage of ch. 323. In 1919 the experience under this law bespoke for it the all-too-common fate of systems then in operation, namely, its insolvency. A legislative committee was appointed to ascertain the status of the fund from the standpoint of its solvency and to make recommendations concerning the future policy of the state with reference thereto. It was found that the benefits promised by the law of 1911 far exceeded the provisions made for the meeting of such promises and that the fund was hopelessly insolvent. This resulted from the fact that the original law was constructed without any reference to actuarial principles and without the benefit of retirement experience. The committee submitted to the legislature of 1921 a comprehensive report upon the subject and the recommendation of legislation which it was thought would place the fund upon a solvent basis and secure to the state and the teachers the results which a thoroughgoing pension law is intended to secure. This resulted in the enactment of ch. 459 of the Laws of 1921, known as the Teachers' Retirement Act and which appears in the revised statutes as secs. 42.20 to 42.54. Under the act teachers are divided into classes A, B, and C. Class A includes all persons who on the day preceding the taking effect of the act were members of or entitled to a benefit from the teachers' insurance and retirement fund created by the act of 1911. Class B included senior teachers in the employ of the public schools, normal

schools, or the university after the taking effect of the act
who prior to that time were teachers in any of said schools
but were not members of the teachers' insurance and retire-
ment fund. (Senior teachers includes those who shall have
arrived at the twenty-fifth birthday anniversary on the 1st
day of July preceding.) Class C includes all not compre-
hended within Class A or Class B. All contracts of employ-
ment made after the act takes effect shall be made subject to
the provisions of the act. This means that the act applies
to all who enter into a contract to teach after the act takes ef-
fect. A deduction from the salaries of all senior teachers
is required. This deduction is placed in a fund known as
the retirement deposit fund. The state also makes a con-
tribution to the same fund. Such contributions are held to
the credit of the teacher in the retirement deposit fund until
the teacher becomes entitled to a benefit therefrom. If the
benefit is other than a single payment, the deposit is trans-
ferred to a fund termed the annuity reserve fund, and the
benefit to which the teacher is entitled is paid from that
fund. Sec. 42.49 specifies the benefits to which a teacher
is entitled upon withdrawal. A distinction is made between
the individual deposits and the state deposits. Upon the
expiration of six months after filing application with the
retirement board having jurisdiction by a member who
has ceased to be employed as a teacher, the accumulation
from a member's deposits may be withdrawn either in a
single payment or in such instalments as the annuity board
shall approve. It appears that under this provision the
withdrawal cannot be made until the expiration of six
months after filing the application by a member who has
ceased to be employed as a teacher. It is next provided that
when a member has ceased to be employed as a teacher the
accumulation from the member's deposits may be applied
by the member as a net single premium at the rate certified
by the annuity board to the purchase of an annuity (a) pay-
able monthly to the member during life, or (b) payable

·monthly to the member during life, and in the event of the death of the member before 180 monthly payments have been made, the monthly payments to be continued to the estate of such member or to such beneficiary as may be designated by the member until 180 monthly payments have been made, or (c) payable monthly to the member during life, and after death of the member monthly payments of one half the monthly amounts paid to the member to be continued to such beneficiary during life as the member shall have designated in the application for retirement allowance, or (d) in such annuity or annuities as the annuity board shall approve. It will be observed that these provisions relate to the individual deposits of the retiring member. By a further provision to be found in the same section it is provided that the accumulation from the state deposits may be applied by the board to the purchase of an annuity described in (a), (b), and (c) above. There are further provisions in the same section for benefits in case of disability, with which we are not presently concerned. The foregoing specifies the benefits to which a retiring member is entitled from the accumulation of individual and state deposits. Sec. 42.50 relates to death benefits, and provides that any member may by written notice to the retirement board having jurisdiction, in such form as it shall approve, designate any person or persons having an insurable interest in the life of the member as a beneficiary to whom any death benefit payable at the time of the death of the member shall be made. The member may from time to time, by a like written notice, change the beneficiary. If no beneficiary shall have been named by the member, such death benefit shall be payable to the estate of the member. Such death benefit shall be the full amount of the accumulation in the retirement deposit fund to the credit of the member from all members' deposits and all state deposits and interest thereon.

We are now coming to the vital question of construction involved, and it is important to bear in mind that here is an

express declaration that if a teacher dies while in the service the estate of the member is entitled to the full amount of his accumulations in the retirement deposit fund arising both from the individual and the state deposits. Following is the provision which gives rise to the controversy here. Sec. 42.51 provides as follows:

"(1) As of the close of the fiscal year preceding the date of issue of a certificate of membership to any member of Class A or Class B, the retirement board shall cause a computation to be made separately for such member of the accumulation which would have resulted at such date from state deposits on account of the compensation for prior service as if this act had been in effect *during such prior service.*

"(2) . . .

"(3) When any member of Class A or Class B who has taught at least twenty-five years in the public schools, the normal schools or the university shall become entitled to any benefit derived from the accumulation of state deposits, the benefit shall be increased by the benefit which would be granted at the rates then in force on an accumulation equivalent to the amount of the computation above defined, and such additional benefit shall be paid from the contingent fund."

Relator's decedent died while in actual service. He was a Class A member of the fund. The exact question is whether the relator, who is the designated beneficiary of the death benefit accruing to the deceased member from the fund, is entitled to recover the amount of the computation provided for in sec. 42.51 in addition to the deposits both individual and state which have been actually paid into the deposit fund. The state maintains that she is not, and that she is entitled only to the amount actually paid into the deposit fund with its accumulations. This contention is based, as we understand it, first, on the language of sec. 42.50, which provides, "Such death benefit shall be the full amount of the accumulation in the retirement deposit fund to the credit of the member from all members' deposits and all state deposits and interest thereon;" it being argued that this

death benefit does not include the computation for prior
service provided by sec. 42.51. The literal interpretation of
sub. (3) of sec. 42.51 is also insisted upon. It is said that
that provision augments only the benefit to which the *mem-
ber* himself may be entitled, and that a deceased member is
not entitled to any benefits. In other words, that sub. (3)
of sec. 42.51 does not increase the benefit to which the es-
tate of a member is entitled. Sec. 42.50, which provides that
the death benefit shall be the full amount of the accumu-
lation in the retirement deposit fund to the credit of the ·
member from all members' deposits and all state deposits
and interest thereon, plainly reveals a legislative purpose to
clothe a member with rather complete title to the state's con-
tributions—a title which passes to his estate upon his death.
This is a general provision applicable to all future entrants
and intended to obtain throughout the years. It affects the
dominant class which the legislature had in mind.

The difficulty arises from the fact that after drawing the
law applying in general terms to future entrants, those al-
ready in the service received special consideration, hence sec.
42.51, which, upon a cursory reading at least, indicates a
legislative purpose to accord those already in the service the
same benefit from the act to which they would have been
entitled had the act been in full force and effect during their
entire teaching experience. Sub. (3) provides that when
such members shall become entitled to any benefit derived
from the accumulation of state deposits the benefit shall be
increased, etc. It does not in express terms say that the
benefit accruing to the *estate* of the deceased member shall
be increased. It will be conceded, we think, that a construc-
tion of the term "member" to include his estate would be
neither an unnatural nor violent construction of the lan-
guage, even in the absence of considerations to which we
shall allude indicating that such was the legislative intent.
The attorney general concedes that if Mr. Dudgeon had
withdrawn from the service prior to his death he would

have been entitled to an annuity based on the computation
for his prior service. The position of the state, therefore,
is, that while Mr. Dudgeon would have been entitled to the
increased annuity had he abandoned his post and deserted
the service, his devotion to duty and ministration to the best
interests of the state forfeits the benefit to his estate be-
cause he died in service. Such a construction of the act
would defeat its very purpose as such purpose is revealed
not only by a consideration of the entire act itself but by a
perusal of the report of the legislative committee pursuant
to which the law was enacted. That report, in common
with all well-considered expressions upon the subject, em-
phasized the desirability of long-continued service, and criti-
cised the act of 1911 because it encouraged an early retire-
ment after reaching the retirement age. If the construction
for which the attorney general contends is to be accorded
the provision under consideration, it becomes apparent that
the interests of the members of Classes A and B who have
reached a retiring age demand that they withdraw from
the service and make secure their title to the accumulations
for past service. This would defeat the very purpose of the
act. This would subject the act to the same criticism in-
dulged by the committee with reference to the act of 1911.
It was not the purpose of the act to drive old and experienced
teachers out of the profession, but rather to hold them in
the profession until their services have ceased to be useful
to the state, at which time the state may retire them without
reluctance, because the fund provides or contributes to their
comfortable support. It so happens that a number of our
noted educators have recently died, making a serious present
demand upon the fund. No doubt they died in the belief
that their beneficiaries would be entitled to the accumula-
tions computed for their past service. They remained in
the service because the state desired their service. They
were valuable to the state. It was the purpose of the law
to encourage them to remain in the service. If the law were

to have a contrary effect it would seem better that it had not been passed at all. From a consideration of the entire scope and purpose of the law we can discover no reasonable hypothesis upon which the legislature could have intended to concede this benefit to one who retires from the service and deny it to the estate of one who responds to the very purpose of the law and bestows upon the state the benefit of his experience and service. A reference to the report of the legislative committee indicates that this matter was given most comprehensive consideration. An actual census of the teachers so far as possible was taken. It was taken with reference to the teachers of the public schools, the normal schools, and the university. Tables and computations without number are set forth showing the number of teachers, their ages and the period of their teaching service, and the amounts necessary to meet the probable annual calls upon the fund for such accrued liability. On page 21 of part 2 of the report it is stated that "the total payments from the contingent fund for these annuities amount to fourteen million nine thousand dollars. The maximum yearly payment will be in 1946. After that, deaths will exceed new retirements. By 1950 all now in service will have retired, and by the end of the present century practically all of the present generation will have passed away and the account with the contingent fund will be closed, except for a small group of disability annuitants."

Some confusion arises because of the creation of the contingent fund. It is not pretended that the fund as a whole is now solvent. The retirement deposit fund consists of the actual deposits made by the members and the state. The annuity reserve fund is a fund equal to the net present value of the prospective benefit payments according to the basic assumptions for the rates on which benefits have been granted. When an annuity is granted, the law requires a transfer to the annuity reserve fund from the retirement deposit fund of a sum sufficient to equal the present value of

the annuity granted. Into the contingent fund goes the income tax imposed by sec. 20.251. It remains there until necessary to make required state deposits, at which time these are transferred from·the contingent fund to the retirement and deposit fund. The deficit under the old law and the accrued liability for the old teachers have been amortized and it is estimated that the income provided by sec. 20.251 and other sources will render the whole fund solvent in about forty years. There is no suggestion anywhere, either in the law or in the report of the committee, that savings will inure to the fund from the death of members while in service, after the manner of lapsing policies— a despicable practice which insurance companies were compelled to abandon long ago. A study of the report of the legislative committee reveals their assumption that all accrued liability will be paid and justifies the conclusion that in their opinion the fund for which they made provision will be sufficient to meet all such accrued liability. It should not be forgotten that the amount which relatrix claims is but the present worth of the annuity to which the decedent would have been entitled had he withdrawn prior to his death. The draft upon the fund is no greater than had he taken advantage of his conceded right and retired before his death. The only difference is that it is now paid in a lump sum instead of a variable number of payments. The amount paid by the state would have been the same eventually had the decedent withdrawn prior to his death. To be sure, the draft upon the fund is greater presently, but it is equal in, the long run. Although it is not expressly declared in sub. (3) of sec. 42.51 that the estate of a member is entitled to a benefit from computations for past service, we think it is plain from the entire act, considering its spirit and purpose, as well as from the report of the committee, that the legislature intended to vest existing teachers with the same title to the accumulations for their past services, under sec. 42.51, that it accorded future entrants to

the state's contributions by sec. 42.50, and that the same benefits inure to the estate of a deceased member in both instances.

We come now to consider the objections urged against the constitutionality of the law. Owing to the belief entertained by the attorney general that the law was in all respects constitutional, the governor appointed William R. Curkeet, Esq., as special counsel to challenge the constitutionality of the law and to present in that respect such objections as he might deem pertinent. Such special counsel contends that the law appropriates public moneys for a private purpose and is violative of sec. 26, art. IV, of the state constitution, which provides that "the legislature shall never grant any extra compensation to any public officer, agent, servant or contractor, after the services shall have been rendered or the contract entered into; nor shall the compensation of any public officer be increased or diminished during his term of office." As we have seen, the law provides pensions for teachers already in service, the amount of which pension is computed with reference to the entire service of the teacher—the period before the enactment of the law as well as the period thereafter. This is the feature claimed to vitiate the law. It is not seriously contended that the law appropriates public funds for a private purpose or grants extra compensation so far as those engaging in service subsequent to the enactment of the law are concerned, but it is urged that the provision referred to operates to accomplish both results with reference to the teachers in service at the time of the enactment of the law.

Such a contention misconceives the purpose of the law, which is to promote a higher efficiency in the educational system of the state by retaining in service seasoned and experienced teachers. Bearing in mind that our constitution is not a grant of, but a limitation upon, legislative power, it is apparent that the legislature may adopt any and all measures which in its judgment will promote the efficiency of the

schools and other educational institutions of the state unless prohibited by some express constitutional provision. As was said by OSTRANDER, J., in *Attorney General v. Connolly,* 193 Mich. 499 (160 N. W. 581), at p. 506:

"Generally, the whole subject of education is for legislative consideration and control, and it is for the legislature to determine, within other constitutional restrictions of its power, in what manner and by what means schools and the means of education shall be encouraged. It is not contended, and cannot reasonably be claimed, that the legislature may not establish a system, both for primary and other public schools, which shall fix the pay, or the salary, of public school teachers, with regulations relating to the age, period of service, and retirement of teachers. If it may do this, it may likewise determine whether it is wise and in the general interest of education that in the system it establishes provision be made for retired teachers whose qualifications for teaching, periods of service and salaries it may control. Having made such a provision, it is for the courts to determine whether the legislature has traveled beyond any other constitutional limitation upon its powers."

If in its judgment the pension system will induce experienced and competent teachers to remain in the service, and that thereby the cause of education will be promoted, the money or funds appropriated for the payment of pensions is appropriated for a public purpose unless the court can say that the pension system will have no such result. This the court cannot do. As already pointed out in this opinion, public sentiment has rapidly crystallized upon the proposition that the pension system does have this result. This is apparent from the conclusions announced by learned students and investigators upon the subject, and is further evidenced by the fact that twenty-five states have enacted legislation along this line. That such laws do not constitute an appropriation of public funds for a private purpose has been either expressly or impliedly held in the following cases: *Trumper v. School Dist.* 55 Mont. 90, 173 Pac. 946; *State ex rel. Haig v. Hauge,* 37 N. Dak. 583, 164 N. W. 289; *Attorney*

*General v. Connolly,* 193 Mich. 499, 160 N. W. 581; *Pearce v. Board of Education,* 85 N. J. Law, 520, 89 Atl. 1026. Whether, so far as teachers in service at the time of the enactment of the law are concerned, it amounts to the granting of extra compensation for service already rendered, in contravention of sec. 26, art. IV, of the constitution, is a question upon which seemingly few courts have expressly ruled. The only cases cited to our attention in which the question was expressly discussed are *Pennie v. Reis,* 80 Cal. 266, 22 Pac. 176, and *State ex rel. Haberlan v. Love,* 89 Neb. 149, 131 N. W. 196. Those cases dealt with laws granting pensions to policemen and firemen, and in both cases it was held that a similar provision did not constitute the granting of extra compensation.

In view of the paucity of judicial discussion of the precise subject presented, a somewhat careful analysis of the situation seems necessary. We will start with the premise that the enactment of a pension system for future entrants into the teaching service increases the efficiency of our educational institutions and thereby promotes public interest. The legislature might well have considered that the success of any pension system, measured by its helpful influence upon the educational institutions, required that the teachers already in service should receive the consideration extended by the terms of the act before us. It might well have considered that a system comprehending only future entrants into the service, or a system which laid out of consideration the past valuable and devoted service of the able and experienced teachers constituting the strength and power of the instructional force of the schools, would give rise to dissatisfaction and discontent, causing the older teachers either to drop out of the service or to continue in service with abated interest and devotion. It would seem that the dangers lurking in such a tendency was a most appropriate matter for legislative concern. This would seem especially true in view of a statement which we find in Bulletin No.

12 of the Carnegie Foundation for the advancement of teaching, already referred to, that "failure to recognize that teachers in service require a provision different from that for future entrants has been the most frequent cause of the breakdown of pension plans." We do not think it necessarily follows that because the legislature, in its attempt to construct an enduring and efficient pension system, saw fit to base the annuity which teachers already in service are to be awarded in part upon the service rendered prior to the enactment of the law, it was its dominant purpose or intent to award such teachers extra compensation for services already rendered. If the legislature deemed such a provision essential, or even helpful, in winning the cordial co-operation of the most valuable members of the instructional force to the promotion of the successful operation of the scheme by holding out to them an inducement for their continued and devoted service, is it not apparent that the dominant purpose of the provision was to promote the public rather than individual or private welfare, not to grant compensation for prior service but to raise educational standards? As said in *Attorney General v. Connolly*, 193 Mich. 499 (160 N. W. 581), at p. 513, by BROOKE, J.:

"Public interest is subserved, not only by inducing persons who are not in the public service to enter, but as well in inducing competent persons already in public employment to continue in it and to render better service, so that they may secure such continuance. Teaching should be made a vocation instead of a stepping-stone to another profession, and anything which tends to make the present educational force so regard it is a distinct public benefit."

Of course if our attention be directed only to the teachers who have been the longest in service, who may serve but a short period in the future, the annuity to which they will be entitled based on their prior service seems somewhat out of proportion to the future service to be expected of them. But the law cannot be tested by considering only the extreme

case. The legislature saw fit to place those who were already in the profession in a class by themselves and accord them separate treatment. If attention be directed to those teachers of but short prior service, the comparative benefits will not seem so disproportionate. It will be seen that the increased annuity resulting from the prior service of a teacher who has served but three or four years, and who must fill out a complete service of twenty-five years before he becomes eligible for retirement, is almost negligible. Taking the class as a whole and considering the averages rather than extreme cases touching the border line of the class, it can be said, we think, that the amount which the state will be called upon to expend on account of prior service is not disproportionate to the public benefit resulting from the sustained or additional interest and devotion of the entire corps comprehended within the class. As we view it, the annuity based on past service is not intended to be, or operate as, compensation for past service. It was rather intended to be, and in fact is, an inducement to the seasoned and experienced teacher to remain in the service and give the public the benefit of his experience. We think there was plenty of room for the legislature to determine that the ultimate success of the pension system itself required special consideration of those constituting the educational forces of the state at the time of the enactment of the law, not as compensation for prior service but rather as an inducement to them to remain in the service, to the great benefit of our educational institutions.

It is said that the act takes the property of the teacher without due process of law. This objection has been considered and effectually answered in *State ex rel. Risch v. Trustees,* 121 Wis. 44, 98 N. W. 954; *Pennie v. Reis,* 80 Cal. 266, 22 Pac. 176, affirmed in 132 U. S. 464; *Trumper v. School Dist.* 55 Mont. 90, 173 Pac. 946; *Allen v. Board of Education,* 81 N. J. Law, 135, 79 Atl. 101; *State ex rel. Haig v. Hauge,* 37 N. Dak. 583, 164 N. W. 289. It does

not take the property of the teacher without due process of law. The state simply prescribes certain features of the contract to which any teacher engaging to teach in the public schools of the state must subscribe. This not only the state but any individual entering into contractual relations has a right to do. The teacher is at perfect liberty to decline to contract in accordance with such terms. The state simply says, "if you do contract to teach in the public schools, a certain portion of your stipulated salary will be deducted and paid into this fund. It will be treated as a deposit for your benefit and returned to you under certain conditions. If those conditions are not complied with, you must consider your salary the net amount remaining after this deduction is made." It is not a taking of property in any sense.

It is further said that the act denies the equal protection of the laws, in violation of the federal constitution, in excluding from its benefit and operation the teachers of the schools of Milwaukee, for whom a special pension system has been maintained since the enactment of ch. 453, Laws of 1907, under consideration in *State ex rel. Van Dyke v. Cary, post,* p. 564, 191 N. W. 546. We do not regard this law as a police regulation. It is a law intended to promote the educational interests of the state. It relates to the conditions upon which the public will contract with those undertaking to teach in the schools of the state. As there is no constitutional requirement that such contract shall operate uniformly throughout the state, the state is at perfect liberty to prescribe one form of contract in one county and another form in another county, or one form of contract in one educational institution and a different form in another. But if the law *were* construed as a police regulation there is abundant basis for classification. The public school system of Milwaukee has many distinct features appropriate to its metropolitan character. The statutes provided a pension system for it before the state pension system was adopted. This system itself resulted from the distinctive

character of Milwaukee's school system.   It is unnecessary to call attention to its many distinguishing characteristics. We may say, however, by way of illustration that our attention is called to a bill now pending in the legislature to extend to other cities of the state the provisions of a statute peculiar to Milwaukee prohibiting the discharge of a teacher after a certain tenure of service without cause and without a hearing.   The objection that the act denies the equal protection of the law cannot be sustained.

*By the Court.*—The motion to quash is denied.   Unless a return is made to the alternative writ within ten days, a peremptory writ of *mandamus* as prayed for will issue.

The following opinion was filed May 1, 1923:

ESCHWEILER, J. (*dissenting*).   With what is expressed in the majority opinion as to the timely need for and the spirit and purpose of provisions for pensioning the teaching force of the state I most heartily agree.   That the compensation to those who devote themselves to the teaching profession has been grossly inadequate, and especially so when compared with compensation for other services rendered to the public, seems beyond question.   To illustrate: In the committee report referred to in the opinion appears a table for the year 1919 to 1920 showing that the average annual salary to teachers with one year's service was $690; at the end of ten years' service such average salary raises to $980. By ch. 605 of the Laws of 1919, sec. 1636—30, Stats., was created, making provision for the appointment of a woman inspector of beauty parlor shops.   Compensation for such services is to be made from a revolving fund to be supplied from the fees to be paid by the members of that profession, and such compensation for inspector services during the fiscal year ending June, 1922, was at the rate of $125 a month with traveling expenses in addition.   Ergo, the compensation allowed for supervising complexion culture is greatly

in excess of the average salary, after ten years' service, paid to one devoted to child culture.

Though heartily agreeing that the legislature may properly devise improvements over what has heretofore been the state policy towards its teaching force, yet I cannot concur in the view of the majority upon the question of statutory construction here presented.

The amount here authorized to be paid to the beneficiary of Professor Dudgeon over the conceded amount of $782, the fund actually in existence at the time of his death, is plainly a contribution from state funds to the amount of such balance of $16,695.74; it is life insurance rather than pension; and is paid to one who rendered no services as a teacher.  It is conceded that no express language is found in the statute relied upon to support such construction authorizing payment of such purely mathematical accumulation.  That the legislature which so carefully provided by express language for the application of such mathematical accumulations failed to expressly provide for such payment as is here authorized is alone sufficient reason against the construction of the majority.

If there is to be judicial expansion of statutes I think it should be towards tightening rather than loosening the strings to the public purse.

Neither can I agree with the majority opinion that there is no invasion of constitutional provision by the act as it is now construed.

To one who has been in the public school service less that twenty-five years, neither he nor any beneficiary can receive more than the fund made up by the actual contributions on his own behalf and by the state during such period; to one who has served twenty-five years or more, or to his beneficiary, may be paid an amount which is increased by reason of services rendered under contracts definitely fixing the compensation for such services prior to the twenty-five years and which present allowance increases in proportion

to the number of extra years of service. I think such a provision to be a violation of sec. 26, art. IV, Const., prohibiting the granting of extra compensation to a public officer or servant after the services shall have been rendered or after the entering into of the contract for such services. The twenty-five years of service may well be fixed as the minimum period of service before any pension can be granted, but saying that the one who has rendered services thirty years shall receive more than the one who has only served twenty-five years is, in my judgment, adding to a compensation that had been agreed upon and accepted for such five additional years of service.

I shall content myself with this expression without mentioning other serious constitutional questions presented.

A motion for a rehearing was denied, without costs, on October 16, 1923.