BUSE, and others, Petitioners, v. SMITH, and others, Respondents.

*No. 75–552. Argued May 5, 1976. Argued in response to June 11, 1976, order September 8, 1976.—Decided November 30, 1976.*
(Also reported in 247 N. W. 2d 141.)

552

*Argued: May 5, 1976.*

For the petitioners there were briefs by *L. C. Hammond, Jr., Michael J. Spector* and *Quarles & Brady,* all of Milwaukee, and oral argument by *Mr. Hammond* and *Mr. Spector.*

For the respondents the cause was argued by *John William Calhoun,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general and *Allan P. Hubbard,* assistant attorney general.

A brief amicus curiae was filed by *James L. Greenwald,* general counsel for Wisconsin Education Association Council, of Madison; *Richard S. Kohn* and *David C. Long,* Lawyers Committee for Civil Rights under Law, of Washington, D. C., for Wisconsin Education Association Council; League of Women Voters of Wisconsin and Wisconsin Secondary School Administrators Association, Inc.

*Argued: September 8, 1976.*

For the petitioners there was a reply brief in response to June 11, 1976, order by *L. C. Hammond, Jr., Michael J. Spector* and *Quarles & Brady,* all of Milwaukee, and oral argument by *Mr. Hammond* and *Mr. Spector.*

For the respondents the cause was argued by *Allan P. Hubbard,* assistant attorney general, with whom on the brief were *Bronson C. La Follette,* attorney general and *John William Calhoun,* assistant attorney general.

CONNOR T. HANSEN, J. We have fully considered the briefs, oral arguments and extensive appendix submitted by the respective parties, and the briefs of the several amicus curiae. It is our conclusion that the negative-aid provisions of school district financing, as mandated by secs. 121.07 and 121.08, Stats., are violative of the rule of uniform taxation set forth in art. VIII, sec. 1, of the Wisconsin Constitution.

As pertinent to this action, sections 121.07 and 121.08, Stats., provide:

*"121.07 General provisions; state aid computation.* In this subchapter:
" . . .
*"(6)* SHARED COST. (a) 'Shared cost' is the cost of operation, minus the operational receipts and amounts received under s. 79.04(1)(c), plus the principal and interest payments on long-term indebtedness and annual capital outlay, for the current school year. The sum of the principal and interest payments on long-term indebtedness and annual capital outlay included in shared cost shall not exceed $100 per pupil. Any amounts contributed by the school district to provide food service programs for the elderly shall not be included.
"(b) In computing state aid for a school district, that portion of its shared cost per pupil which is more than 10% above the average per pupil shared cost for the previous school year [for school districts of like organization],[1] as determined by the state superintendent, shall be excluded except as provided in par. (c).

---

[1] Deleted by ch. 39, Laws of 1975, effective July 31, 1975.

"(c) In computing state aid on the shared cost excluded under par. (b), the secondary guaranteed valuation shall be used.

"*(7)* SCHOOL DISTRICT GUARANTEED VALUATIONS FOR DISTRICTS OPERATING BOTH ELEMENTARY AND HIGH SCHOOL GRADES. 'School district guaranteed valuation' is the amount set forth in pars. (a) and (b) multiplied by the number of resident pupils enrolled.

"(a) The primary guaranteed valuation shall be $71,-200 in the 1973–74 school year and $75,500 thereafter.[2]

"(b) The secondary guaranteed valuation shall be an amount rounded to the nearest $100 determined by dividing the equalized valuation of the state by the number of pupils enrolled in the state.

"...

"*(10)* MILL LEVY RATE. 'Mill levy rate' is the sum of the rates derived in pars. (a) and (b).

"(a) The primary required levy rate is the quotient of the shared cost not excluded by sub. (6) (b) divided by the school district primary guaranteed valuation.

"(b) The secondary required levy rate is the quotient of the shared costs determined in sub. (6) (c) divided by the school district secondary guaranteed valuation."

*121.08 State aids; payments by certain districts.* (1) The state shall pay to the school district a sum equal to the amount by which the primary guaranteed valuation exceeds the school district equalized valuation, multiplied by the primary required levy rate and a sum equal to the amount by which the secondary guaranteed valuation exceeds the school district equalized valuation multiplied by the secondary required levy rate.

"*(2)* The school district shall pay to the state the sum of pars. (a) and (b).

"(a) Beginning with the 1977–78 school year the amount by which the school district equalized valuation exceeds the primary guaranteed valuation, multiplied by the primary required levy rate.

---

[2] Amended by ch. 39, Laws of 1975, effective July 31, 1975, increasing the primary guaranteed valuation from $75,500 to $102,-700. Thus it appears the West Allis district, one of the petitioners, may no longer be classified as a negative-aid district.

"(b) The amount by which the school district equalized valuation exceeds the secondary guaranteed valuation, multiplied by the secondary required levy rate.

"*(3)* If the net amount computed under subs. (1) and (2) results in a negative sum, that amount shall constitute the negative aid payment due. The negative aid payment due shall be certified to the school district by the state superintendent on or before March 15. The school district treasurer shall transmit the amount certified to the state treasurer on or before May 15. The state treasurer shall credit this amount to the negative aid payment appropriation under s. 20.255(1)(k). No negative aid payment shall be required under this subsection prior to the 1976–77 school year."

In addition, sec. 121.07(8) and sec. 121.07(9), Stats.,[3] establish different primary and secondary guaranteed valuations for school districts operating only elementary grades (k–8), and for school districts operating only high school grades (9–12). The effect of these different valuations is to reduce the positive aid which such districts might receive, or to increase the negative aid which they might pay in relation to school districts which operate both elementary and high school grades (k–12), and thus to encourage districts to operate both elementary and high school grades (k–12). Section 121.08(4) provides for phased transitional computations ending in 1984.[4]

The foregoing statutes contain a district power equalization factor based upon the equalized valuation of real estate for taxation purposes located within each school district. As a result of the introduction of the district power equalization factor into the procedure for financing school districts, certain of the school districts in the

---

[3] Amended to increase primary guaranteed valuations by ch. 39, Laws of 1975, effective July 31, 1975.

[4] Sec. 121.09, *Special transitional aid,* created by ch. 39, Laws of 1975, effective July 31, 1975, supplements transition.

state will not receive any state aid. Instead, they will be required to pay a portion of their property tax revenues into the general state fund to ultimately be redistributed to other school districts in the state. The districts so required to make payments into the state fund have become known as "negative-aid districts." The school districts receiving state aid have become known as "positive-aid districts."

This is a class action, brought on behalf of all property taxpayers residing in negative-aid school districts and on behalf of all such school districts themselves. The petitioners are Glenn A. Busé, a property taxpayer residing in the Nicolet Union High School District, a negative-aid school district; other property taxpayers residing in other negative-aid districts; Joint School District No. 1, located principally in the city of West Allis; and other negative-aid school districts. A stipulated statement of facts has been submitted.

Sec. 121.08, Stats., is intended to achieve equalization of taxing power among the school districts of Wisconsin. Power equalization legislation is based on the premise that student equality of opportunity results when: (a) Regardless of a school district's actual property valuation, its tax levy rate for school purposes produces the same net amount of available school revenue as the same tax levy rate in every other like school district; and (b) there are no per-pupil spending disparities between districts.

The two objectives are pursued concurrently by means of the aid formula set out in sec. 121.08, Stats. The formula possesses two fiscal components: The "primary guaranteed valuation" per pupil figure and the "secondary guaranteed valuation" per pupil figure. The secondary guaranteed valuation figure is always less than the primary guaranteed valuation figure. The primary figure is set biennially by the legislature while the second-

ary figure equals the actual statewide equalization valuation per public school pupil. The secondary figure is used only to compute positive or negative aid for a school district on that portion of its shared cost per pupil which is more than ten percent above the average per pupil shared cost for the previous school year. *See:* sec. 121.07 (6) (b) and (c).

Thus, the secondary guaranteed valuation per pupil figure serves as a built-in disincentive to spend above and beyond 110 percent of the state average per pupil shared cost for the previous school year. If a positive-aid district spends beyond this level, it will receive less aid. If a negative-aid district spends beyond this level, it will be required to pay more of its revenue to the state. The obvious aim of this secondary aspect to the formula is to encourage districts to remain close to the median state per pupil spending ceiling.

As the objective of the aid formula is to treat each school district as if its equalized valuation per pupil equals the state guaranteed valuation figures, the first computation is to determine the difference (positive or negative) between the state guaranteed valuation figures (both primary and secondary) and a district's actual equalized valuation per pupil. The district's equalized valuation per pupil is computed by dividing the full value of the taxable property in the school district (as determined by sec. 121.06, Stats.) by the total number of children enrolled therein as determined by sec. 121.07 (1), Stats.[5]

The positive or negative difference computed as above is then multiplied by the *primary required mill levy rate*, and the *secondary required mill levy rate*. The primary required mill levy rate is established by applying the provisions of sec. 121.07 (10) (a), Stats. The primary re-

---

[5] Amended by creation of sec. 121.07(1) (bm), ch. 39, Laws of 1975, effective July 31, 1975.

quired mill levy rate is the district's per pupil cost or the state shared cost per pupil ceiling (as determined by sec. 121.07(6)(b)), whichever is less, divided by the primary guaranteed valuation per pupil, as fixed by the provisions of sec. 121.07(7)(a).[6]

The secondary required mill levy rate is determined by the applying of the provisions of sec. 121.07(10)(b), Stats. The secondary required mill levy rate is the district's per pupil cost, if any, above the state shared cost per pupil ceiling (as determined by sec. 121.07(6)(b)) divided by the secondary guaranteed valuation per pupil. The secondary guaranteed valuation per pupil is fixed by the provisions of sec. 121.07(7)(b). *(See:* Footnote 6.)

The result of these computations determines whether a district is a negative-aid district and therefore pays a portion of its tax-generated revenue into the state fund or is a positive-aid district and receives payments from the state fund.

In applying these statutory formulas, two factors determine whether a particular school district is a negative-aid district which pays money to the state or is a positive-aid district which receives money from the state. First, how the actual equalized valuation of the district compares to the amount fixed by the legislature as the state primary guaranteed valuation per pupil and the secondary guaranteed valuation per pupil as determined by applying the statutory formula. Second, whether the district spends more or less in actual cost per pupil (teachers' salaries, transportation, interest on long-term indebtedness, annual capital outlay, etc.) than the state primary shared cost ceiling.

The following are some of the results of application of the formula:

---

[6] Different primary and secondary guaranteed valuations for k–8 and 9–12 districts are fixed by sec. 121.07(8) and sec. 121.07 (9). Otherwise the formulas remain the same.

1. If the local district's equalized valuation per pupil is less than the state secondary guaranteed valuation per pupil, the district will *always* be a positive-aid district, whether its per pupil cost is less than or greater than the state shared cost ceiling.

2. If the local district's equalized valuation per pupil is less than the state primary guaranteed valuation per pupil but more than the state secondary guaranteed valuation per pupil, the district's status will be positive-aid until its per pupil cost is significantly greater than the state shared cost ceiling.

3. If the local district's equalized valuation per pupil is equal to the state primary guaranteed valuation per pupil, it will receive no positive aid and will pay negative aid in proportion to the amount by which its per pupil cost exceeds the state shared cost ceiling.

4. If the local district's equalized valuation per pupil is greater than the state primary guaranteed valuation per pupil, the district will *always* be a negative-aid district whether its per pupil cost is less than or greater than the state shared cost ceiling.

The power equalization objective of the aid formula is realized when the computed negative and positive aids are incorporated in a determination of the actual mill rate which a district will have to impose in order to achieve a desired actual cost per pupil. The intention is to achieve equal tax dollars for educational purposes (*i.e.,* an equal actual cost per pupil) from equal tax effort. That is, any two school districts who choose to spend a given amount per pupil on education, will receive that amount, regardless of how much their actual equalized valuation per pupil differs, by taxing at the same mill rate.

The aid formula achieves its basic objective of district tax power equalization when viewed in terms of money spent per pupil. The formula purports to get equal tax

dollars for educational purposes from equal tax effort regardless of the disparity in tax base. Thus, if the actual cost per pupil were precisely the same in each of approximately 450 school districts, the actual mill rate for educational revenue would be the same in each district of the same classification.

The new aid formula replaced Wisconsin's old "foundation plan" of educational financing which was in effect from 1949 to 1973. Under the former program a minimum or foundation valuation per pupil was guaranteed to the state's school districts. The state set a "guaranteed valuation per pupil."

If the actual equalized property valuation per pupil in a given district was less than the statutorily provided guaranteed valuation per pupil, the state, from general state funds, provided the difference between the amount per pupil which the district actually raised by applying its mill rate to its own equalized valuation per pupil and the amount the district would have raised had its own mill rate been applied to the state guaranteed valuation per pupil.

Thus under the foundation plan, any district that was at or below the guaranteed valuation per pupil figure was roughly equalized in terms of taxing power with any other district similarly situated.

A district above the guaranteed valuation received no state aid under the above formula. Such a district, however, as well as below-guaranteed valuation districts, received a flat aid payment from the state, granted on a per-pupil basis. The foundation plan included no negative-aid requirements.

In reaching our conclusion in this case, we consider the following issues:

1. Are the negative-aid school districts barred from challenging the constitutionality of the new school aid formula?

2. Does art. X, sec. 3 of the Wisconsin Constitution, which requires the legislature to ". . . provide by law for the establishment of district schools, which shall be as nearly uniform as practicable," impose a constitutional duty upon the legislature to provide an equal opportunity for education for all school children in the state?

3. Do section 4 and the other sections of art. X, Wisconsin Constitution require some measure of local control over primary and secondary education? If so, what measure of control?

4. Is the negative-aid payment provided for in section 121.08(2) and (3), Stats., a tax? If so, what is its nature?

5. Does the required negative-aid payment to the state fund of a portion of the tax revenues raised by a school district for redistribution by the state to positive-aid districts, violate art. VIII, sec. 1, Wisconsin Constitution?

6. Is the negative-aid classification an unconstitutional infringement upon the rights of residents of negative-aid districts to due process and equal protection under the laws as provided by section 1, article I, Wisconsin Constitution and the 14th amendment of the United States Constitution?

## STANDING.

The petitioners include five negative-aid school districts.

■ The general rule is that a political subdivision of the state does not have the legal right or status as against the state or another state agency to contest the constitutionality of a statute. *Columbia County v. Wisconsin Retirement Fund* (1962), 17 Wis.2d 310, 116 N.W.2d 142; *Town of Germantown v. Village of Germantown* (1975), 70 Wis.2d 704, 235 N.W.2d 486. There are limited exceptions to the rule, but they are not here relevant. *See Ful-*

ton Foundation v. Department of Taxation (1961), 13 Wis.2d 1, 108 N.W.2d 312, 109 N.W.2d 285; and Associated Hospital Service v. Milwaukee (1961), 13 Wis.2d 447, 109 N.W.2d 271.

 The establishment and operation of public schools is a governmental function of the state, and the legislature may and has delegated portions of that power to the various school districts. State ex rel. Wis. Luth. H. S. Conference v. Sinar (1954), 267 Wis. 91, 65 N.W.2d 43; School Dist. v. Burnett County School Committee (1952), 262 Wis. 484, 55 N.W.2d 874.

 School districts, in exercising that delegated power, act as agencies or arms of the state, and thus under these circumstances, lack the standing to challenge the constitutional validity of these acts of the state. Joint School District v. State Appeal Bd. (1973), 56 Wis.2d 790, 203 N.W.2d 1; State ex rel. La Crosse v. Rothwell (1964), 25 Wis.2d 228, 130 N.W.2d 806, 131 N.W.2d 699.

 The other six petitioners are resident taxpayers in negative-aid school districts and parents of children who attend schools within those districts. They are directly affected in a financial and personal way by the enactment of the negative-aid provisions of the new school aid formula and thus they have standing to challenge its validity, both on their own behalf and on behalf of other taxpayers and parents-residents in negative-aid districts.

*ARTICLE X, SEC. 3, WISCONSIN CONSTITUTION.*

Article X, sec. 3, Wisconsin Constitution reads:

"*District schools; tuition; sectarian instruction; released time.* SECTION 3. [As amended April 1972] The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years; and no sectarian instruction shall be allowed there-

in; but the legislature by law may, for the purpose of religious instruction outside the district schools, authorize the release of students during regular school hours. [1969 J.R. 37, 1971 J.R. 28, vote April 1972]"

The Wisconsin Constitution, unlike the United States Constitution,[7] explicitly commands that the legislature ". . . shall provide by law for the establishment of district schools, . . ." There is no question that one of the functions of all government is to promote an efficient educational system *(See State ex rel. Dudgeon v. Levitan* (1923), 181 Wis. 326, 329, 193 N.W. 499, and *State ex rel. Thomson v. Giessel* (1953), 265 Wis. 558, 61 N.W.2d 903) and that the subject of public education and the establishment and operation of public schools is a governmental function of this state.

In the early case of *State ex rel. Comstock v. Joint School District* (1886), 65 Wis. 631, 636, 27 N.W. 829, this court stated:

". . . The constitutional requirement is that 'the legislature shall provide by law for the establishment of *district* schools.' Inasmuch as there must be school districts before there can be district schools, and inasmuch as the school district system was in full operation in the territory when the constitution was framed and adopted, it is clear that section 3 of article X is a recognition of that system, and a mandate to the legislature to preserve and continue its essential features. . . ."

However, it is a fundamental rule that when dealing with the state constitution as contrasted with the federal constitution, the search is not for a grant of power to the legislature, but for a restriction thereon. *Manitowoc v. Manitowoc Rapids* (1939), 231 Wis. 94, 97, 285 N.W. 403; *Outagamie County v. Zuehlke* (1917), 165 Wis. 32, 35,

[7] *San Antonio School District v. Rodriguez* (1973), 411 U.S. 1, 93 Sup. Ct. 1278, 36 L. Ed.2d 16, 411 U.S. 959, 93 Sup. Ct. 1919, 36 L. Ed.2d 418.

161 N.W. 6. Thus this court in *Manitowoc, supra,* p. 98, established that the clear purpose of sec. 3, art. X was not to *grant* a power to the legislature to establish schools, for that power would exist without grant, but to compel the exercise of the power "to the extent designated."

The "extent designated" was specifically set forth in art. X, sec. 3. First, the legislature was to provide for the establishment of district schools; second, those schools were to be "as nearly uniform as practicable"; and third, those schools were required to be "free and without charge for tuition to all children between the ages of 4 and 20 years."

The respondents frequently advance the phrase "equality of educational opportunity." All would agree this is an altruistic goal; however, so far as the state is concerned, its efforts toward such an objective must fall within the dictates of the criteria set forth in art. X, sec. 3. These are to establish district schools which are "as nearly uniform as practicable," and provide schools which are "free and without charge for tuition to all children between the ages of 4 and 20 years."

As to the latter criteria, this court has held that when the legislature has provided for each child, the privileges of *a* district school, which he or she may freely enjoy, that constitutional requirement is complied with. *See: State ex rel. Comstock, supra,* p. 636. Equality of opportunity for education is equated with the right of all school children to attend a public school free of charge and without charge for tuition; although charges may be imposed for out-of-district residents, for vocational school training, and for certain incidentals. *See: State ex rel. Comstock, supra; Manitowoc, supra;* and *Board of Education v. Sinclair* (1974), 65 Wis.2d 179, 222 N.W.2d 143.

What the framers of the constitution intended the phrase "as nearly uniform as practicable" to mean was

discussed by this court in *State ex rel. Zilisch v. Auer* (1928), 197 Wis. 284, 289, 290, 221 N.W. 860, 223 N.W. 123, wherein it was stated:

". . . An examination of the debates in the conventions that framed our present constitution and the constitution of 1846 (which contained a similar provision) discloses that the members of those conventions, when they were framing the article relating to schools, were concerned, not with the method of forming school districts, but with the character of instruction that should be given in those schools after the districts were formed, —with the training that these schools should give to the future citizens of Wisconsin."

The same conclusion was expressed in *Joint School Dist. v. Sosalla* (1958), 3 Wis.2d 410, 420, 88 N.W.2d 357, and *Larson v. State Appeal Board* (1973), 56 Wis.2d 823, 827, 202 N.W.2d 920.

If "character of instruction" was all that was required to be "as nearly uniform as practicable" under the mandate of the constitution, then it was left up to this court to ultimately determine what subjects were to be included in "character of instruction" and to the legislature to determine what uniformity was "practicable."

*Pacyna v. Board of Education* (1973), 57 Wis.2d 562, 204 N.W.2d 671, concerned the age of admission of children to kindergarten. It was there decided that all children of identical age should have an equal opportunity to enter public schools and that such uniformity was mandated by the constitution unless such uniformity throughout the state was found to be impracticable by the legislature. However, in arriving at that conclusion, this court stated at p. 564:

"Art. X, sec. 3, of the Wisconsin Constitution, provides a limitation upon the power and the authority of the legislature in the establishment of district schools. The article requires district schools to be 'as nearly uniform

as practicable' and to be 'free and without charge for tuition to all children between the ages of 4 and 20 years.' . . ."

The involvement of the legislature from the framing of the constitution to the present and the many cases which have come before this court, emphasize that the equal opportunity for education as defined by art. X, sec. 3, is a fundamental right.

To hold that the right to equal opportunity for education is a fundamental right under the Wisconsin Constitution and to hold that the legislature is constitutionally mandated to provide an equal opportunity for education as that term is defined by the criteria set forth in sec. 3, art. X, is not necessarily to validate as constitutional any means chosen by the legislature to achieve that end.

We understand respondents to suggest that once the constitutional mandate to provide an equal opportunity for education is established, then it must follow that the means chosen by the legislature to accomplish that end, i.e., the school aid formula, is valid.

We cannot subscribe to such rationale. First, the phrase equal opportunity for education, as used above, is not an all inclusive phrase under which any action which moves toward such equality is immediately validated. That phrase is defined by words of the constitution—by the criteria set down in sec. 3, art. X; the second of which is the requirement that all district schools shall be "as nearly uniform as practicable." Thus what was meant by the framers of the constitution when they used the terms "as nearly uniform as practicable" is all-important. Second, even if it were to be determined that the equal opportunity for education mandate requires an equal dollar expenditure per pupil or the equalization of the revenue raising power of the various school districts, yet if the means chosen to accomplish that end

violates other provisions of the constitution, it must be held invalid. *See State ex rel. Dudgeon v. Levitan, supra,* pp. 339, 340.

In its interpretation of constitutional provisions this court is committed to the method of analysis utilized in *Board of Education v. Sinclair, supra.* The court will view:

(1) The plain meaning of the words in the context used;

(2) The historical analysis of the constitutional debates and of what practices were in existence in 1848, which the court may reasonably presume were also known to the framers of the 1848 constitution, *see State ex rel. Zimmerman v. Dammann* (1930), 201 Wis. 84, 88, 89, 228 N.W. 593, and *State ex rel. Comstock, supra;* and

(3) The earliest interpretation of this section by the legislature as manifested in the first law passed following the adoption of the constitution. *Payne v. Racine* (1935), 217 Wis. 550, 259 N.W. 437.

Whether absolute uniformity of an equal opportunity for education in all school districts of the state is socially desirable, is not for this court to decide. We can only conclude that the plain meaning of sec. 3, art. X does not mandate it.

Both petitioners and respondents presented excellent source material on the constitutional debates that preceded the adoption of the constitution, and on the historical background of education in the state.[8] *State ex rel. Comstock v. Joint School District, supra,* recognized that the school district system was in full operation in the territory when the constitution was framed and adopted, and that sec. 3, art. X was a recognition of that system, and a mandate to the legislature to preserve and continue its essential features.

---

[8] *The Founding of Public Education in Wisconsin,* Jorgenson (1956); *Public Education in Wisconsin,* Patzer (1924); and *Journal and Debates Constitutional Convention* (1847-48).

One of the essential features of that system was that it was then locally funded and supported although not exactly free. Prior to 1836, all schools in the territory of Wisconsin were private schools. They were community organized, maintained, supported and controlled, with the territorial government exercising no control whatever over them. *Patzer,* p. 5.

The first general law relating to the organization of common (district) schools was passed by the legislative assembly in 1839. This law was amended in 1840, and in 1841 there was enacted a comprehensive school law embodying the laws of 1839 and 1840. The 1841 law was further amended in 1843. These general laws had several common threads:

1. They created county, town, and school districts as subordinate units of the territory and delegated to these subdivisions powers in regard to the organization and maintenance of schools.

2. They created powers in the various county commissioners to levy property taxes for the maintenance of the schools.

3. They created powers in the electors of each town to levy property taxes for school purposes.

4. They set up a system inspection of the various schools. (*Patzer,* p. 7)

In 1845, a special school law was passed, authorizing the establishment of a free public school system in the village of Southport. Thus, impetus was given to the establishment of free schools in other parts of the territory, and to the shaping of public sentiment favoring a free public school system. (*Patzer,* pp. 14, 15) Yet the other essential characteristics of the school system, *i.e.,* local control and funding, remained in effect.

In their adoption of art. X of the 1848 Wisconsin Constitution, the framers recognized the fact that public education was a function of the state. While elevating the free school concept into a constitutional mandate, the

framers preserved in part local funding and support of district schools. Free school supporters believed that public education supported by all classes of the population was essential to the success of democracy. (*Jorgenson,* pp. 68–93)

■ We cannot agree with the contention of the respondents that the mandate in art. X, sec. 3, especially when read in conjunction with the other provisions of art. X, requires that revenue raising powers of the school districts must be equalized in the manner prescribed by secs. 121.07 and 121.08, Stats.

*LOCAL CONTROL UNDER ART. X, SEC. 4.*

■ The language of art. X, sec. 3, provides that "district schools" were to be established by the state, that is, schools in each separate district. Art. X, sec. 4, requires that each town and city raise tax ". . . for the support of common schools *therein,* . . ." (Emphasis added.) Thus the clear implication is that the various districts, at least as to a part of the funding of their schools, did possess some measure of control.

Experience Estabrook, Chairman of the Constitutional Committee on Education and School Funds, expressed his rationale for the minimum local tax requirement of art. X, sec. 4, as follows:

". . . It was intended that whatever the amount of the school fund might be, one-third of the expense of supporting schools, should be borne by each town. If a sufficient sum was not contributed by the school fund, the towns should have power to raise more. This provision was directly for the advantage of the poor. The gentleman who had last spoken, might not appreciate this; but a poor man with a family of children, and no fancy lots to dispose of, could understand the advantage. Experience had shown that if nothing was contributed by the town, the common schools languished, and select schools rose

on their ruins. The school fund of Connecticut was so large as to be sufficient to defray the expenses of the education of every child within the limits of the state. Yet there, until a year or two, the district school-system had declined. No adequate interest was felt by the people, in common schools, unless they contributed to their support. To obviate this danger, the committee had inserted the section." *Journal and Debates Constitutional Convention 1847–48*, p. 335.

With the adoption of the constitution and the creation of the state, the subject of public education became an expressed concern of the state, with the state assuming the control of the establishment and operation of district schools. Respondents seem to argue that the very nature of the subject makes that power an unlimited plenary power over education.

While the state's power over education is extensive, there remains some local control.

In the forward to Coons, Clune and Sugarman, *Private Wealth and Public Education* (1970), at p. vii, Professor James S. Coleman described the basic competing forces underlying the development of education in America:

"THE HISTORY OF EDUCATION SINCE the industrial revolution shows a continual struggle between two forces; the desire by members of society to have educational opportunity for all children, and the desire of each family to provide the best education it can afford for its own children. . . ."

That the framers of the constitution recognized the importance of local interest and some measure of local control over local schools is evident from the statement of Experience Estabrook set forth herein.

Sec. 40 of ch. 19 of the Revised statutes of 1849 first manifested a construction of the state-local division of power in school matters when it empowered district boards to teach, in addition to those required subjects

any ". . . such other branches of education as may be determined upon by the board." Provisions similar to sec. 40 have been included in the Wis. Stats., since 1849. (See sec. 118.01 and secs. 120.12–120.13, Stats.)

The grant of power embodied in sec. 40, ch. 19, of the Revised statutes of 1849, and subsequent similar statutes could be termed a delegated power and not a constitutionally granted power. School districts are after all, but arms of the state, carrying out state duties. Nevertheless, the power to determine educational subjects over and above those imposed by the state is a necessary adjunct to the constitutionally granted power of localities to raise revenues for the support of schools therein, art. X, sec. 4. Localities are empowered to raise funds for education, and to spend those funds for educational purposes over and above those required by the state.

Considering the expressed provisions of art. X, sec. 4; the expressed concern of the framers of the constitution that local interest in local school systems be maintained; and the contemporaneous construction evidenced by sec. 40, ch. 19, Revised statutes of 1849, it is evident that the power possessed by local districts to determine what educational subjects it will offer over and above those required by the state, and to raise funds therefor, is not merely a delegated power. Rather the state-local control dichotomy in that limited regard is part and parcel of the constitution. That dichotomy has been an essential feature of our educational system since the adoption of the constitution and that fact in itself is entitled to some weight. *Board of Education v. Sinclair, supra.*

Local districts retain the control to provide educational opportunities over and above those required by the state and they retain the power to raise and spend revenue ". . . for the support of common schools *therein*, . . ." (Emphasis added.) These rights of the local districts have their foundations in the constitution.

## NEGATIVE-AID PAYMENTS; A TAX?

Both respondents and *amici* assert that the negative-aid payment provided for in sec. 121.08, Stats., is something other than a tax. Respondents argue that negative-aid is a "cost of doing business," while amici argue that it falls within the exercises of the police power of the state. We find neither of these arguments convincing.

The only possible source of revenue for the required payments is the basic source of school district funds, *i.e.*, local property taxes. *See* sec. 120.16 (6), Stats., which requires payment out of "general property taxes." Under the statutorily created negative-aid formula, the method of meeting the required payments are made an integral part of the local taxing process.

Respondents confuse the purpose of the tax with the definition of the nature of state and local taxes. It is undisputed that education is a statewide concern and that money raised through the negative-aid provision will go toward the fulfillment of the state's duty to provide education. But to determine whether a tax is to be classified as a state or a local tax, one must look to the entity which directly levies the tax, and which in turn directly provides governmental benefits therefor. If that entity is the state, it is a state tax. If that entity is a political subdivision of the state, it is a local tax. The question is who *directly* (and not indirectly) levies the tax?

The funds paid to the state in the form of negative-aids can only be derived from revenues produced by taxes levied by the local district on property located within the negative-aid school district. The revenues from which these negative-aid funds are derived are raised by local taxes, not state taxes. The tax is a local property tax, locally levied, locally assessed and locally collected. For the last 128 years it has been locally spent for educational

purposes of the district. It is a tax, and a local tax, not a state tax.

Negative-aid payments are not part of the levy, assessment or collection of these district taxes, but they are part of the distribution and disbursements of the proceeds of these taxes. They are an integral part of the taxing process, and subject to those constitutional rules which relate to the distribution and disbursement of tax proceeds.

 The parties concede that the state has the power to levy a statewide property tax for the purpose of supporting education, and in fact some form of such tax was in effect in Wisconsin from 1885 until 1933. However, the present statutory scheme vests the power of property taxation in local districts, and the taxes which they impose pursuant to this delegated power are local taxes, not state taxes.

*RULE OF TAXATION UNIFORM, ART. VIII, SEC. 1.*

At the time the briefs were filed in this case, there were 19 negative-aid districts in the state. Among them were k–8, 9–12, and k–12 school districts. Pursuant to secs. 121.07 and 121.08, Stats., they were required to pay into the state fund a portion of the revenues raised by their local tax levies. The funds received from the districts are commingled with state revenues and ultimately disbursed by the state as state school aids to the positive-aid districts throughout the state.

The respondents suggest the enactment is valid because: (1) There is a strong presumption of constitutionality; (2) public education is a matter of statewide concern; and (3) the purpose of the statutes are to insure equality of tax burden among the property taxpayers of Wisconsin. The latter would be achieved if all school districts in the state had the same spending level; thus

resulting in all property being taxed at the same mill rate. These are correct general statements and set forth laudable social and public policies with which few, if any, would disagree. However, as applied to the instant case, the latter proposition has two fallacies. First, each school does not spend at the same level. Second, and most important, we are not here concerned with a statewide property tax, but rather with a local property tax levied by the individual districts. The fact that a relatively few districts are required to pay the state but a small portion of their tax revenues is of no consequence.

The levying of taxes constitutes the enforcement of proportional contributions from persons and property, levied by the state or municipality for the support of its government and its public needs. *Fitch v. Wisconsin Tax Comm.* (1930), 201 Wis. 383, 230 N.W. 37.

The genesis of the rules of taxation are found in art. VIII, sec. 1, of the Wisconsin Constitution, which provides in pertinent part: "The rule of taxation shall be uniform. . . ."

In *Knowlton v. Supervisors of Rock County* (1859), 9 Wis. 378 (*410), p. 389 (*420), it was stated:

". . . Its mandate, it is true, is very brief, but long enough for all practical purposes; long enough to embrace within it clearly and concisely the doctrine which the framers intended to establish, viz.: that of equality. . . ."

Cooley[9] states the general rule concerning the requirement of equality and uniformity:

"The requirement of equality and uniformity of taxation relates to the rate of taxation, the valuation for taxation, territorial equality, and, according to one view, the inclusion of all property as the subject of taxation. The rate of taxation must be the same, at least as to the same class. . . The valuation must be based upon the same percentage, at least as to the same class of property . . .

[9] *Law of Taxation*, Cooley, 1924, sec. 260, p. 562.

There must be territorial equality throughout the taxing district."

*Knowlton, supra,* pp. 387, 388, 389 (\*419, 420, 421), also held:

". . . This principle of justice and equality which requires that each person should contribute towards the public expenses his proportionate share, according to the advantages which he receives, lies at the foundation of our political system; and, in our opinion, it was to give to it a greater permanency and force, and to secure its more rigid observance, that the section above quoted was introduced into the constitution. We have already said that all are agreed that the levying of taxes by the properly constituted authorities of a county, city or town government, for their support, is as much an exercise of the taxing power as when they are levied directly by the state. . . . [*T*]*here can be no uniform rule which is not at the same time an equal rule, operating alike upon all the taxable property throughout the territorial limits of the state, municipality or local subdivision of the government, within and for which the tax is to be raised. . . .*" (Emphasis added.)

*Gottlieb v. Milwaukee* (1967), 33 Wis.2d 408, 419, 147 N.W.2d 633, set forth the emphasized portion of the above stated rule and pronounced adherence to this interpretation of the constitutional provision here under consideration.

It is well established that there are certain inherent limitations and restrictions on the power to tax, particularly as they relate to territorial equality or uniformity. Cooley, *supra,* sec. 86, pp. 211, 212, states two of them to be: ". . . [the] inherent limitation on the power of the legislature to tax a local subdivision for a purely local purpose, or to compel such subdivision to tax itself for such a purpose. . . ." A state purpose must be accomplished by state taxation, a county purpose by county taxation, and a public purpose for an inferior district by

taxation on such district. *State ex rel. Owen v. Donald* (1915), 160 Wis. 21, 125, 126, 151 N.W. 331.

Wisconsin has long recognized this rule of constitutional interpretation, *i.e.*, the purpose of the tax must be one which pertains to the public purpose of the district within which the tax is to be levied and raised. This court so held at least as early as *State ex rel. New Richmond v. Davidson* (1902), 114 Wis. 563, 576, 88 N.W. 586, 90 N.W. 1067, and in doing so, quoted extensively from Pennsylvania cases:

". . . Thus, in an early Pennsylvania case it is held that:

" 'By taxation is meant a certain mode of raising revenue for a public purpose in which the community that pays it has an interest. The right of a state to lay taxes has no greater extent than this.' *Sharpless v. Philadelphia,* 21 Pa. St. 148.

"In a later case in that state it is held that:

" 'An act authorizing the levy of contributions for a private purpose, or a purpose which, though public, is one in which the people from whom it is exacted have no interest, is not a law, but a judicial sentence, and not within legislative authority.' *Grim v. Weissenberg,* 57 Pa. St. 433.

"So in that state it is further held that:

" 'The rule is, local taxation for local purposes, or taxation on the benefits conferred, but not beyond them. The legislature, by its general powers, cannot levy, or authorize a municipality to levy, a local tax for general purposes. Taxation exacts money or services from individuals as their respective shares of contribution to any public burden.' *Hammett v. Philadelphia,* 65 Pa. St. 146."

*Davidson* emphasizes that the theory of equality of taxation is that the taxpayer is compensated for the taxes he pays in some public purpose by the unit of government which imposes the tax.[10] The equality, so far as prac-

---

[10] *See: Hasbrouck v. Milwaukee* (1860), 13 Wis. 42, 49 (*37); *Brodhead v. City of Milwaukee* (1865), 19 Wis. 658, 671 (*624).

ticable, is inherent in the very idea of tax and as stated in *Knowlton v. Supervisors of Rock County, supra,* without equality there can be no uniformity.

In *Lund v. Chippewa County* (1896), 93 Wis. 640, 648, 649, 67 N.W. 927, the legislature authorized the state to receive funds for buying land and constructing a state institution in Chippewa county. Chippewa county responded to this legislation and raised money by issuing bonds to be amortized out of future tax levies. The action of the county was challenged. This court found the legislation not to be violative of art. VIII, sec. 1, and in so doing held that the state legislature could authorize the county to give money for this purpose [state institution] but " '. . . the legislature has no power, against the will of the municipal corporation, to compel it to contract debts for local purposes in which the state has no concern, or to assume obligations not within the ordinary functions of municipal government. . . . The state, in such cases, may remove the restrictions and permit action, but it cannot compel it.' . . ."[11]

The rule was repeated in *Chicago & N. W. R. Co. v. State* (1906), 128 Wis. 553, 661, 108 N.W. 557. In *State ex rel. Owen v. Donald, supra,* 126, 127, it was stated:

"There may lurk in the field of present protection to person or property or both, or, in what seems quite idealistic, a high moral duty to mankind, in general, without regard to place or time, the essential element of consideration, yet it must be remembered that even the demands of charity, springing from dire distress in some foreign jurisdiction, or any outside of the particular taxing unit, are not a legitimate basis for taxation of property in the particular jurisdiction, because of the absence of reciprocal obligations and benefits, in a governmental sense. *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 575, 88 N.W. 595, 90 N.W. 1067. 'There

[11] *See: State ex rel. Board of Education of City of Oshkosh v. Haben* (1868), 22 Wis. 629 (*660).

can be no legitimate taxation unless for the uses of the government' levying it. 2 Dillon, Mun. Corp. (4th ed.) §736."

More recently, in *State ex rel. Wisconsin Development Authority v. Dammann* (1938), 228 Wis. 147, 183, 277 N.W. 278, 280 N.W. 698, the rule was simply stated as "It is the general rule applicable to appropriations that a tax must be spent at the level at which it is raised." The same principle was subsequently enunciated in *State ex rel. American Legion 1941 Conv. Corp. v. Smith* (1940), 235 Wis. 443, 293 N.W. 161, and *State ex rel. Warren v. Nusbaum* (1973), 59 Wis.2d 391, 208 N.W.2d 780.

Regardless of the merits of the legislative enactments or the worthiness of the cause, we conclude that the state cannot compel one school district to levy and collect a tax for the direct benefit of other school districts, or for the sole benefit of the state. The statutes here under consideration are violative of art. VIII, sec. 1, of the Wisconsin Constitution.

*DUE PROCESS AND EQUAL PROTECTION.*

Petitioners argue that the negative-aid classification constitutes a deprivation of the due process and equal protection rights of the residents of negative-aid districts.

It has been established that the right to equal opportunity for education is a fundamental right guaranteed by the Wisconsin Constitution. This court has held that art. I, sec. 1, Wis. Const., is substantially the equivalent of the due process and equal protection clauses of the 14th amendment of the U. S. Const. *(See Chicago & N. W. Ry. v. La Follette* (1969), 43 Wis.2d 631, 169 N.W.2d 441; and *State ex rel. Sonneborn v. Sylvester* (1965), 26 Wis.2d 43, 132 N.W.2d 249) and has followed

federal doctrine that where a statutory classification adversely affects or interferes with a fundamental constitutional right, the classification is subject to strict scrutiny and the normal presumption of constitutionality will not apply. *Town of Vanden Broek v. Reitz* (1971), 53 Wis.2d 87, 93, 191 N.W.2d 913.

The strict scrutiny standard should here be applied to the negative-aid classification. Petitioners contend that the negative-aid classification constitutes illegal discrimination against the residents of negative-aid districts in that: (1) The classification ignores the ability to pay of the residents of the negative-aid districts (age, average annual income, etc.) ; (2) the classification ignores the overburden of other municipal taxes which may exist in negative-aid districts; (3) the classification ignores the cost variations for factors of education, such as transportation, between districts, and (4) the classification creates a strong incentive for taxpayers in negative-aid districts, both consolidated and nonconsolidated, to spend less per pupil than taxpayers in positive-aid districts.

We are of the opinion that the classifications established thereunder would survive the strict scrutiny test. The first three factors are as likely to occur in positive-aid districts as in negative-aid districts and thus no claim of systematic discrimination against negative-aid districts may be heard in regard to them. The fourth factor is based upon speculation and conjecture, and thus will not serve as a basis to invalidate as unconstitutional, the law which establishes the classifications.

We are satisfied there is adequate justification for the classification sufficient to meet the requirements of the strict scrutiny test. The petitioners have presented no arguments nor advanced any authority which convinces us that any disincentives to negative-aid districts rise to the level of discrimination violative of the due process and equal protection rights of the residents of negative-aid districts.

We have considered and examined the authorities of other jurisdictions submitted by the respective counsel. The various school aid programs under consideration in those authorities are, we deem, significantly different from the one here under consideration, and, therefore, not of material assistance.

*By the Court.*—The negative-aid provisions of secs. 121.07 and 121.08 of the Wisconsin statutes are declared unconstitutional as violative of art. VIII, sec. 1, of the Wisconsin Constitution.

ROBERT W. HANSEN, J. *(concurring)*. Under which shell, state tax or local tax, does the pea of the negative state aid tax come to rest. For, even in the carnival version of the proverbial shell game, the pea has to end up under one of the shells. Since the tax is mandated and the amount of the tax to be locally collected is determined by the state, the writer, unlike the majority, would see the negative state aid tax as a state tax. As such, it is clearly unconstitutional since it violates the first requirement of uniformity—[1] the tax imposed being unequal as to similarly situated real estate in the state. Neither majority opinion nor dissenting opinion contend to the contrary.

However, even if the negative state aid tax is viewed as a local tax, as the majority holds, the writer joins the majority opinion to find such tax to be unconstitutional for the reason that, as the majority opinion states, the legislature " '. . . has no power, against the will of the municipal corporation, to compel it to . . . assume obligations not within the ordinary functions of municipal government. . . .' " (Quoting *Lund v. Chippewa County* (1896), 93 Wis. 640, 648, 649, 67 N.W. 927.)

The dissenting opinion seeks to meet the twofold requirement of uniformity—that the tax be uniform in rate within the taxing district and that it be levied for a

[1] *See:* Art. VIII, sec. 1, Wis. Const.

public purpose of such taxing district—by moving the pea from one shell to another. For the purpose of meeting the uniform application requirement, the negative aid tax is treated as a local tax. To avoid the second requirement of uniformity, that local taxes be raised for the use and purpose of the body or district imposing the tax, the minority opinion stresses that education is a public purpose of statewide concern. Admittedly that fact validates a state property tax, uniform in rate throughout the state to further such public purpose. But the pea ought not be put under the shell of a local tax to meet one of two requirements of uniformity and then moved to the shell of a state tax to avoid the second of the two twin requirements.

Our state constitution is not a grant of power, but a restriction on what would otherwise be an exercise of plenary power. (*See: Manitowoc v. Manitowoc Rapids* (1939), 231 Wis. 94, 97, 285 N.W. 403.)[2] The test of whether a statewide public purpose is served does not replace the specific requirements of the Uniformity Clause in determining the constitutionality of a local tax. If we apply such "hand is quicker than the eye" shifting of the test, the specific restrictions and requirements of the state constitution become meaningless. Further, if uniformity as to rate on a statewide basis is not required, and, if the public purpose to be served is not limited to the public purpose of the taxing district, the constitutional requirement of uniformity of a state-imposed local tax is effectively repealed.

As to such local tax, the Uniformity Clause requires that the tax not only be uniform within the taxing district, but also that it be used for the public purpose of such local taxing district. The majority so concludes, and the cases cited support such conclusion. The writer

[2] Quoting *Outagamie County v. Zuehlke* (1917), 165 Wis. 32, 35, 161 N.W. 6.

agrees with the majority that the negative aid tax, if viewed as a local tax, is unconstitutional because it mandates a local tax that, while uniform within the taxing district, is not to be used for local public purposes of such local taxing district.

I am authorized to state that Mr. Chief Justice BRUCE F. BEILFUSS joins in this concurring opinion.

ABRAHAMSON, J., DAY, J. and HEFFERNAN, J. *(dissenting)*. The majority opinion correctly concludes that the right to equal opportunity for education is a fundamental right under the Wisconsin Constitution and that the legislature is constitutionally mandated to provide an equal opportunity for education. We further agree with the majority that article X of the Constitution recognizes public education as a state function and at the same time requires funding of public education by both the state and local governments. However the majority erroneously concludes that the school district financing system set forth in secs. 121.07 and 121.08, Stats., violates art. VIII, sec. 1 of the Wisconsin Constitution which provides that "the rule of taxation shall be uniform."·

## I.

This court has on numerous occasions stated that all legislative acts are presumed constitutional and that if any doubt exists it must be resolved in favor of the constitutionality of a statute. Our task is not to judge the merits of the statute or the wisdom of the legislature. Our task is to determine whether the statute clearly contravenes some constitutional provision. *Gottlieb v. Milwaukee,* 33 Wis.2d 408, 415–416, 147 N.W.2d 633 (1967). *See also School Dist. v. Marine Nat. Exchange Bank,* 9 Wis.2d 400, 403, 101 N.W.2d 112 (1960); *State ex rel. Thomson v. Giessel,* 265 Wis. 207, 215–216, 60

N.W.2d 763 (1953), 265 Wis. 558, 565, 61 N.W.2d 903 (1953); *Chicago & N. W. Ry. v. La Follette,* 27 Wis.2d 505, 521, 135 N.W.2d 269 (1965).

As stated in *Payne v. Racine,* 217 Wis. 550, 561, 259 N.W. 437 (1935):

"Before a statute can be said to be unconstitutional, the statute must lack in public purpose 'so clear and palpable as to be perceptible by every mind at the first blush.' This was said by Chief Justice DIXON, who sat in the constitutional convention and helped frame the charter of our state. *Brodhead v. Milwaukee,* 19 Wis. *624, *652. 'We must bear in mind,' said Chief Justice WINSLOW, 'the well-established principle that it [the statute] must be sustained unless it be clear beyond reasonable question that it violates some constitutional limitation or prohibition.' *Borgnis v. Falk Co.,* 147 Wis. 327, 348, 133 N.W. 209. 'The rule of all courts,' said Mr. Justice BARDEEN, 'is that a statute will be declared unconstitutional only when it is shown beyond reasonable doubt that it conflicts with the fundamental law. It is equally true that the courts will seek every reasonable mode of reconciliation of the statute with the constitution, and it is only when reconciliation has been found impossible that it will be declared void.' *State ex rel. Hicks v. Stevens,* 112 Wis. 170, 172, 88 N.W. 48."

We do not believe that the majority has accorded this statute the proper presumption of constitutionality. It is not clear beyond reasonable question that the statute conflicts with the constitution. "If there was any doubt as to the power, duty would require us to resolve such doubt in favor of the validity of the act." *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 579, 580, 88 N.W. 596, 90 N.W. 1067 (1902).

The majority concedes that equality of educational opportunity is a legitimate legislative goal, that a statewide property tax could be levied to support our schools, provided the rate is uniform, and that local districts should have some local control and some power to raise

additional revenue by local taxation. The legislation before us is an innovative attempt to accommodate these concepts while at the same time preserving to individual districts a significant measure of local control over the quality and financing of education. The majority today uses doctrines designed and heretofore employed to prevent unjust impositions of the tax power to strike down a law which may offend the proprietary views some taxpayers have come to hold regarding school district revenues, but which certainly does not offend either the letter or the spirit of the Constitution.

## II.

The majority holds that the statute in question violates art. VIII, sec. 1, Wis. Const., which states in part that "the rule of taxation shall be uniform." The majority notes—and we agree—that this clause has been interpreted to mean that the rate of taxation for property must be uniform throughout the territorial limit of the unit imposing the tax.[1] The statute under attack here complies with the principle of territorial uniformity since the rate of taxation in each school district is the same for all property located therein.[2]

[1] ". . . [T]here can be no uniform rule which is not at the same time an equal rule, operating alike upon all the taxable property throughout the territorial limits of the state, municipality or local subdivision of the government, within and for which the tax is to be raised." *Knowlton v. Supervisors of Rock County,* 9 Wis. 378 (*410), 389 (*421) (1859). ". . . In *Knowlton* the court held that once property is selected for taxation it must be taxed in its entirety and the same rate must be applied to it as to all property in the tax district." *Gottlieb v. Milwaukee,* 33 Wis.2d 408, 419, 147 N.W.2d 633 (1967). *See also* Newhouse, *Constitutional Uniformity & Equality in State Taxation,* pp. 234–248 (1959).

[2] The uniformity clause of the constitution applies only to assessment and taxation and does not control the expenditure of

Several early Wisconsin cases interpreted the uniformity clause more broadly than merely territorial uniformity. These cases said that the uniformity clause required that taxes be levied and expended only for public purposes (in contrast with private purposes) and that a state-wide tax be levied only for a state-wide purpose, a county-wide tax for a county purpose and so on, down to the smallest unit.[3]

However, later cases of this court have categorized the principle that tax revenues be spent at the level at which they are raised as being part of the public purpose doctrine.[4] This court has recognized that the public purpose

money arising out of any assessment or taxation of property. *Sawyer v. Gilmore*, 109 Me. 169, 83 Atl. 673 (1912); *Kerr v. Perry School Tp.*, 162 Ind. 310, 70 N.E. 246 (1904); *State ex rel. Woodward v. Moulton*, 57 Mont. 414, 189 Pac. 59 (1920).

"It is quite impossible for us to perceive in what way it can be argued that this legislation violates the rule of uniformity in taxation of property. This rule was placed in the constitution for the protection of the taxpayer so that there may be no discrimination in property taxation. There is none here. The law does not change in the least the taxpayer's burden. He pays exactly the same tribute whether his whole tax contribution remains in the state treasury or whether part of it goes to the city treasury. He has not been taxed at one rate on a part of his property and at a higher rate upon another part . . . .

"It is equally difficult for us to see how this law can be in any sense called a law for the assessment or collection of a tax. It does not become effective for any substantial purpose until after the assessment and collection of the tax are fully completed. The processes of assessment and collection remain the same in operation and in effect as before." *State ex rel. Superior v. Donald*, 163 Wis. 626, 628, 629, 158 N.W. 317 (1916).

[3] *State ex rel. New Richmond v. Davidson*, 114 Wis. 563, 578, 90 N.W. 1067 (1902); *State ex rel. Garrett v. Froehlich*, 118 Wis. 129, 140, 94 N.W. 50 (1903).

[4] ". . . The requirement of a public purpose obviously applies to all forms of taxation, whether levied by the State or any of the subdivisions of the State to which the power of taxation may be delegated, and whether the tax is general in the State or munici-

doctrine is a well-established limitation on the power of taxation, which is not derived from the uniformity clause or from any other specific constitutional provision.[5] The public purpose doctrine is an inherent limitation on taxation which is variously attributed to the nature and form of our government, the reservations of

pality, or special, that is, levied by way of special assessment in limited taxing districts created for public improvements. Whatever the form of the tax, it is inherent in its nature that it must be levied for a public, as distinct from a private, purpose; and it also must be public in the sense that the purpose must pertain to the district taxed, that is, the tax levied upon the entire State must be for a general public purpose as distinguished from a distinctively local or municipal purpose. On the other hand, a tax cannot, or rather should not, be levied upon a particular district of a State alone for a general public purpose not peculiar to the district taxed." *Judson on Taxation,* sec. 391, pp. 413–414 (1917).

[5] *State ex rel. Wisconsin Devel. Authority v. Dammann,* 228 Wis. 147, 183, 277 N.W. 278, 280 N.W. 698 (1938); *State ex rel. American Legion 1941 Conv. Corp. v. Smith,* 235 Wis. 443, 451, 293 N.W. 161 (1940); *State ex rel. Singer v. Boos,* 44 Wis.2d 374, 381, 171 N.W.2d 307 (1969); *State ex rel. Warren v. Nusbaum,* 59 Wis.2d 391, 413, 414, 208 N.W.2d 780 (1972).

"It is a maxim of the law that the power to appropriate is coextensive with the power to tax and so has fundamental and inherent limitations.

"The first of such limitations is implied from the very nature of organized society. That exists for public purposes of a governmental character. The scope of such purposes, it must be conceded, except as expressly or by necessary implication fundamentally limited, is quite broad.

"It follows that we need not, necessarily, depend on any fundamental limitations of the power to tax. There would be such if we had no constitution. Then, a tax could not properly be levied to take property from one person and give it to another.

"Public purpose and the character of the tax otherwise, would determine its legitimacy. A state-wide tax could only be levied for state-wide purposes and so on down to the smallest taxing district. In either case, the purpose would need to be public, in the sense of a matter of common or general interest to those

individual rights, and the concepts of equity, fairness and due process.[6]

The reason this court has at times derived the public purpose doctrine from the uniformity clause is that the basic rationale of the uniformity clause is the same as that of the public purpose doctrine.

The uniformity clause guarantees that the burden of supporting government will be fairly and equitably ap-

upon whom the burden is laid." *State ex rel. Owen v. Donald,* 160 Wis. 21, 124, 125, 151 N.W. 331 (1915).

[6] The origin of the public purpose doctrine has been variously attributed by this court to the due process and equal protection clauses of the state and federal constitutions, *State ex rel. Wisconsin Development Authority v. Dammann* (1938), 228 Wis. 147, 277 N.W. 278, 280 N.W. 698; art. IV, sec. 4, of the United States Constitution, which guarantees to every state a republican form of government, *Heimerl v. Ozaukee County* (1949), 256 Wis. 151, 40 N.W.2d 564; and art. VIII, sec. 2, of the Wisconsin Constitution which provides that no money shall be paid out of the treasury except in pursuance of an appropriation by law. *State ex rel. La Follette v. Reuter* (1967), 33 Wis.2d 384, 147 N.W.2d 304. Other authors have attributed the doctrine to judicial articulation of the belief that governmental power should be used for the benefit of the entire community. Mills, *The Public Purpose Doctrine in Wisconsin,* 1957 Wis. L. Rev. 40.

*See also: State ex rel. Bowman v. Barczak* (1967), 34 Wis.2d 57, 62, 63, 148 N.W.2d 683; Eich, *A New Look At The Internal Improvements And Public Purpose Rules,* 1970 Wis. L. Rev. 1115." *State ex rel. Warren v. Nusbaum,* 59 Wis.2d 391, 413, 414, n. 8, 208 N.W.2d 780 (1972).

The needed protection against arbitrary legislative action may be found in the state and federal equal protection limitations. Newhouse, *supra,* pp. 601–608. "[T]he decisions of this court, as well as a half century's practical construction, reinforce the conclusion so strongly suggested by the constitutional debates . . . that the clause 'The rule of taxation shall be uniform' if applicable to excise taxation at all, means no more than the general equality clauses of the constitution, or 'the equal protection of the law' guaranteed by the XIVth amendment." *Nunnemacher v. State,* 129 Wis. 190, 220, 108 N.W. 627 (1906). *See also Judson, supra,* note 4.

portioned among the citizens. In *Weeks v. Milwaukee,* 10 Wis. 186 (\*242), 201 (\*257) (1860), this court declared that the uniformity clause is "to protect the citizens against unequal, and consequently unjust taxation." In *Knowlton v. Supervisors of Rock County,* 9 Wis. 378 (\*410), pp. 387–388 (\*419–\*420) (1859), it was stated:

". . . The theory of our government is, that socially and politically all are equal, and that special or exclusive, social or political privileges or immunities, cannot be granted, and ought not to be enjoyed. In consonance with this theory, that of taxation, whether as the subject of legislative action, judicial inquiry, or constitutional law, has always been that the burdens of supporting the government should be borne equally by all the individuals composing it, in proportion to the benefits conferred, and that the tax payer receives for the money exacted, a just compensation by the protection afforded his person and property by the proper application of the tax. This principle of justice and equality which requires that each person should contribute towards the public expenses his proportionate share, according to the advantages which he receives, lies at the foundation of our political system; and, in our opinion, it was to give to it a greater permanency and force, and to secure its more rigid observance, that the section above quoted [Uniformity Clause] was introduced into the constitution."

The issue for this court is therefore not a question of the application of the oft-interpreted uniformity clause— in the sense of territorial uniformity—which is clearly achieved in the statutes before us. The issue in this case is whether the "negative aid" statute violates the public purpose doctrine, the underlying aim of which is to protect citizens against an exercise of governmental power which is arbitrary and contrary to basic concepts of fairness and due process.[7] In applying the public pur-

---

[7] ". . . A state tax law will be held to conflict with the Fourteenth Amendment only where it proposes, or clearly results in, such flagrant and palpable inequality between the burden im-

pose doctrine to determine the validity of a statute, we are not applying mechanical rules; we are determining whether the legislature violated fundamental rules of fairness and equity and should be prevented from levying unjust and unfair exactions.

### III.

The public purpose doctrine, as enunciated by the majority, has two aspects:

1. The tax must be for a public—not a private—purpose.

2. The purpose of the tax must be one which pertains to the public purpose of the district within which the tax is to be levied and raised.[8]

That education in the public schools is a public, not a private purpose, is conceded, and no more need be said.

The heart of the majority opinion is that the negative aids law violates the second part of the rule. The majority contends that the law compels "one school district to levy and collect a tax for the direct benefit of other school districts, or for the sole benefit of the state" in

posed and the benefit received, as to amount to the arbitrary taking of property without compensation—'to spoliation under the guise of exerting the power of taxing.' " *Dame v. Jackson*, 256 U.S. 589, 599, 65 L. Ed. 1107, 41 Sup. Ct. 566, aff'g 237 Mass. 50, 129 N.E. 606. *Cooley on Taxation*, sec. 89, p. 216 (4th ed. 1924).

[8] A shorthand statement of this rule also used by the majority is that the tax must be spent at the level at which it is raised. This shorthand statement of the rule cannot be taken literally. Since its inception this state has returned general revenue raised at the state level to local school districts to be spent there. Conversely, our statutes expressly require localities to raise property tax revenues and remit them to the state. *See* secs. 70.60, 70.63, Stats. It cannot be contended that these practices of long standing are invalid, provided state revenues, by whomever spent, are spent in aid of a state purpose.

violation of art. VIII, sec. 1, Wis. Const. As one can see from the holding of the majority and from the cases following, the rule that "taxes must be spent at the level at which they are raised" means only that there must be some correspondence between the taxing district or districts upon whom the burden of a given tax rests and the district or districts thought to be benefited by the expenditure of the proceeds. One taxing district cannot be taxed for the sole benefit of another taxing district.[9] This court has said " 'there can be no legitimate taxation unless for the uses of the government' levying it."[10]

[9] *Cooley on Taxation,* secs. 314–317, p. 650 *et seq.* (4th ed. 1924). *See Tennant v. Sinclair Oil & Gas Co.,* 355 P.2d 887 (Wyo. 1960) striking down a tax levied by a school district and used to fund high schools in other districts. *See also Sweetwater Co. v. Hinkle,* 491 P.2d 1234 (Wyo. 1971), 493 P.2d 1050 (1972), where the court challenged the state educational financing scheme.

[10] *State ex rel. Owen v. Donald,* 160 Wis. 21, 127, 151 N.W. 331 (1915). The court further said: "In these citations, and many more which might be referred to, the principle will be found declared which has been incorporated into most elementary works. Where there is no public purpose, in the sense of carrying on some part of the machinery of government, there is no power to tax. As put by the federal supreme court in *Loan Asso. v. Topeka,* [20 Wall. 655, 670], an object which is not within the purposes for which governments are established, falls outside the limitation upon the right to take the property of the citizen, by way of taxation, for public use." (p. 125)

Petitioners rely heavily upon the 1952 Nebraska case of *Peterson v. Hancock,* 155 Neb. 801, 54 N.W.2d 85 (1952), to sustain their position. In *Peterson* a county Blanket Mill Levy was imposed upon the school districts within each county, but the law provided that a district with less than five students would not receive any funds from this levy after the first year of operation of the law. The purpose of this portion of the law was to effect the consolidation of small school districts. The Nebraska Supreme Court concluded that the law violated the constitutional principle here in question because it levied a tax upon districts with less than five students for the exclusive benefit and local purpose of districts with more than five students. Yet the tax in question was a county tax, and, in Wisconsin at least, the appro-

The public purpose limitation upon the tax power is not an arbitrary rule governing legislative power but is a doctrine of fairness whose purpose is to prevent fundamentally unjust and unfair exactions. The limited function of the judiciary in this regard must be kept firmly in mind, lest dicta and language used in prior cases be applied as if they and not the constitutional and inherent limitations on the legislature were the source of the doctrines to be applied. An analysis of the cases and the application of the rule to the specific fact situations will show that the negative aids legislation violates neither the public purpose rule nor this court's prior decisions.

*Lund v. Chippewa County*, 93 Wis. 640, 67 N.W. 927 (1896), and *State ex rel. Board of Education of City of Oshkosh v. Haben*, 22 Wis. 629 (*660) (1868), are cited by the majority for the rule the state could not require

priate inquiry would be whether or not the purpose of this county tax pertained to the county taxed. Since the funds raised did benefit districts within the county taxed, the constitutional rule would not have been violated in Wisconsin. *See also Board of Tes. Jt. Class A School Dist. v. Board of Co. Comm.*, 83 Ida. 172, 359 P.2d 635 (1961).

In *Rinder v. Madison*, 163 Wis. 525, 158 N.W. 302 (1916), Dane County, pursuant to state law, levied a tax on all taxable property in Dane County for the county highway fund. The city of Madison objected to the tax on the ground that the county was levying a tax for the county highway system which excluded city streets. Thus the city residents objected that they were subjected to a tax conferring a benefit on residents of towns and villages, contrary to the rule of uniformity and equal protection of the law. This court upheld the tax. Taxation is not limited to property directly benefiting from the purpose for which the taxes are raised. The justice or injustice of the limits of the taxing district when fixed by the legislature cannot be questioned by the court. "The alleged injustice to residents of cities by compelling them to contribute to the improvement of highways located outside of their municipal territory presents no constitutional objections, and if actual inequalities of burdens result that is a subject for legislative consideration." (p. 531)

one or more counties of the state, less than the whole, to support a state institution.[11] A similar case was *State ex rel. McCurdy v. Tappan*, 29 Wis. 664 (1872), in which the court held that the state could not require Oshkosh to raise funds for furnishing soldiers to the United States Army. The act was invalid on two grounds: (1) it singled out one municipality; and (2) furnishing bounties to volunteers was not a municipal purpose. Thus the act violated the uniformity clause and the constitutional requirement (art. VII, sec. 2) that "the legislature establish but one system of town and county government which shall be as nearly uniform as practicable." One of the purposes of the uniformity clause, said our court, "was to protect the taxpayers in any particular county or town from being compelled by the legislature without their consent to bear burdens in respect to matters not strictly

[11] Another aspect of the public purpose doctrine—not in issue here—is whether the state can expend funds for purely local purposes. The majority quotes from and relies on *State ex rel. New Richmond v. Davidson*, 114 Wis. 563, 88 N.W. 596, 90 N.W. 1067 (1902), which involved this issue. In that case the state appropriated funds to the city of New Richmond to aid it in expenses incurred as a result of a cyclone. The appropriation was challenged on the ground that the state was taxing all citizens for private and local purposes—not for public and state-wide purposes. The court said (p. 578):

"If the object of the appropriation in question was purely local to the city of *New Richmond*, then the rule of uniformity would require the tax to supply the same to be limited to that municipality. If, however, the contribution was to subserve the common interest and well-being of the people of the state, then the appropriation was legitimate."

The court held that the state appropriation was valid because helping the city and people of New Richmond served the common interest and well-being of the state at large. This court took a broad and liberal view of state purpose to uphold the legislative determination. The New Richmond case involved a state tax and state expenditure; it did not involve a local tax or local expenditures.

municipal which other counties or towns are not required to bear." *Tappan, supra,* at p. 679.

Thus the proposition for which *Lund, Haben* and *Tappan* stand is that the state shall not use its power to impose a tax on one local government—rather than all local governments—for state purposes without the consent of the local entity. The imposition of an extra tax burden solely on taxpayers of one unit was declared invalid. The rule established was that all local units—all taxpayers—should make a contribution to support the state purpose.

The negative aid law in question here applies across the state to all school districts. No one school district is singled out to support another school district or state education. Thus the negative aids legislation is substantially different from the statutes in the cases cited by the majority, and the application of those cases to our question is therefore questionable. However, it is important to note that the negative aids law does not contravene the quoted black-letter doctrines set forth in these cases. No taxpayer is relieved of his proportional contribution to the support of education. The goal of the legislation is that all Wisconsin taxpayers shall contribute their fair share to the support of public education, and all will be, relative to any given spending level, equally burdened. The fact that the result of the negative aid provision will be that some but not all districts will pay negative aid is not grounds for its invalidation. The rules governing aid payments apply to all school districts alike which meet the terms and conditions of the statute. *Cf. Joint School Districts v. Sosalla,* 3 Wis.2d 410, 420, 88 N.W.2d 357 (1957); *Columbia Co. v. Wisconsin Retirement Fund,* 17 Wis.2d 310, 322, 116 N.W.2d 142 (1962); *West v. Tax Commission,* 207 Wis. 557, 564, 242 N.W. 165 (1932).

Accordingly, we conclude that the statute before us meets the test set forth by these cases that the state not

require one local unit to support a state institution or purpose. The next issue is whether the legislature is requiring the local school districts to raise and expend funds for a purpose which is not germane to the local school district in violation of the public purpose doctrine.[12] "The question is, therefore, narrowed to a single point: Is the purpose in this instance a public one—does it concern the common welfare and interest of the municipality?" *Brodhead v. Milwaukee,* 19 Wis. 658 (\*624), 689 (\*655) (1865). The majority opinion assumes—without any discussion—that a payment by a school district to the state for redistribution for education is not germane to any purpose of the school district making the payment. However, the *Lund* and *Haben* cases recognize the power of the local unit to raise funds for a state purpose. A local government raising funds for a state purpose does not violate the uniformity clause or public purpose doctrine—if it can be shown that the unit also has an interest in the state purpose.

That expenditures are made outside the district do not render the appropriation invalid because such expenditures may still be a valid school district purpose.[13]

In *Sharpless v. Mayor of Philadelphia,* 21 Pa. 147, 171, 172 (1853), a case relied upon by the majority, the

---

[12] The question what is a local purpose cannot be answered by any precise definition; the answers change to meet new developments and changing conditions. 15 McQuillin, *Municipal Corporations,* sec. 39.19, p. 32; vol. 16, sec. 44.35, p. 97.

[13] "And, to give locality to a purpose in respect to which a public expenditure is to be made, it is not essential that the public work created by means thereof should have its *situs* within the district. It is the district's *interest* in the improvement, and not its location, which is the test whether an object is or is not a proper subject of district taxation." *Maltby v. Tautges,* 50 Minn. 248, 253, 52 N.W. 858, 860 (1892). *Cf. State ex rel. American Legion 1941 Conv. Corp. v. Smith,* 235 Wis. 443, 452, 293 N.W. 161 (1940). Gray, *Limitations of Taxing Power and Public Indebtedness,* p. 246, *et seq.* (1906).

court noted that the right of a local unit to fund public works was not confined to those works within the geographical unit whose people were taxed. The determinative factor is not the geographical location of the expenditure but the interest of the local unit and its people. The Pennsylvania court set forth the test as follows:

". . . Local taxes for local purposes, and general taxes only for purposes which concern the whole state, are a vital principle of our political system, and there is no feature in it which has attracted more unqualified admiration from those who understand it best. Its justice is too obvious to need explanation. . . .

"The city's charter was granted by the legislature. It may be enlarged. The same power which gave them the privileges which they have, may give them others. It cannot be so enlarged as to enable the corporate authorities to embark the city in a private business, or to make the people pay for a thing in which they have no interest. But within these limits there is nothing to prevent an indefinite extension of their corporate powers.

"But it is insisted that the right of a city or county to aid in the construction of public works, must be confined to those works which are within the locality whose people are to be taxed for them. The Water-Gap Company stops its road north of Vine street, outside of the city limits, and the Hempfield road has its eastern terminus at Greensburg, three hundred and forty-six miles west of Philadelphia. I have already said that it is the *interest* of the city which determines the right to tax her people. That interest does not necessarily depend on the mere location of the road. Therefore the location cannot be an infallible criterion. . . . A railroad may run through a county without doing its inhabitants the least service. May such a county assist to make it, while a city which it supplies with bread and whose trade is doubled by it must not do so, merely because it ends outside of an imaginary line that limits the corporate jurisdiction? It seems very plain that a city may have exactly the same interest in a road which terminates outside of her borders, as if the depot were within them, and a great deal more than if it passed quite through. If she has an interest in any

part, she has probably an equal interest in every part."
(pp. 171–172)

Even if there is a national or state interest, the courts
have recognized that there can also be a local interest—
which the local unit has in common with the whole state—
sufficient to sustain or authorize the local tax. In *Sharp-less* the court decided that the city had a special local
interest in the improvements outside the city limits.

In *Brodhead, supra,* at p. 674 (*639–*640), it was
argued that Milwaukee has no obligation to pay soldiers
who entered the service of the United States. "They are
not the soldiers of Milwaukee, but of the nation . . . .
In what view, then, will taxation to pay these bounties
be justified? Is its object to fill up the national armies
and put down rebellion? This is not a matter of local
or municipal duty or concern." This court upheld the
law finding a municipal purpose although national and
state interests were present.

These cases support the rule that a local interest, even
one which a local unit has in common with the state, is
sufficient to justify local taxation. The courts have re-
peatedly said that if the local unit has *any* such local
interest, then the question of taxation is for the legisla-
ture and not for the courts. In *Brodhead* (p. 686, *652)
this court said:

". . . The objects for which money is raised by taxa-
tion must be public, and such as subserve the common in-
terest and well being of the community required to con-
tribute. To justify the court in arresting the proceedings
and declaring the tax void, the absence of all possible
public interest in the purposes for which the funds are
raised must be clear and palpable—so clear and pal-
pable as to be perceptible by every mind at first blush."

In *Sharpless, supra* (p. 172), the Pennsylvania court
similarly gave great weight to the legislative determina-
tion if one could find any special local purpose.

"But it is not our business to determine what amount of interest Philadelphia has in either of these improvements. That has been settled by her own officers, and by the legislature. For us it is enough to know that the city may have a public interest in them, and that there is not a palpable and clear absence of all possible interest perceptible by every mind at the first blush. All beyond that is a question of expediency, not of law, much less of constitutional law."

If the majority (and petitioner) are saying that the payments to the state are invalid because property receiving no direct benefit from a tax for a particular purpose should not be taxed for that purpose, this position is not defensible. A citizen must pay a proportion of a school tax although he or she has no children. As *Cooley on Taxes* so aptly states:

"No system of taxation has yet been devised which will return precisely the same measure of benefit to each taxpayer or class of taxpayers in proportion to payment made, as will be returned to every other individual or class paying a given tax; and it follows that neither the federal nor state courts have power to revise the taxing system of a state for the purpose of attempting to produce a more just distribution of the burdens of taxation than that arrived at by the legislature." (Sec. 89, p. 216)

The question then is whether there is a local public purpose which rationally justifies the legislative enactment requiring the local school districts to return some revenues raised by school taxes to the state.[14]

---

[14] "If a public purpose can be conceived which might rationally be deemed to justify the act, the court cannot further weigh the adequacy of the need or the wisdom of the method." *State ex rel. Zillmer v. Kreutzberg*, 114 Wis. 530, 549, 90 N.W. 1098 (1902).

"It is undoubtedly the duty of the legislature which imposes or authorizes municipalities to impose a tax, to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified in interposing when a violation of this principle is clear and the reason for

## IV.

We conclude that the local property tax system which will result from the new formula, including the negative-aid provisions, does not violate the public purpose rule. We are unwilling to say that school districts, as a matter of constitutional law, have an absolute, unqualified right to the full revenues raised by the property tax within their districts.[15]

interference cogent. And in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation." *Citizens' Savings & Loan Asso. v. Topeka*, 20 Wall. 655, 664, 665, 22 L. Ed. 455 (1874).

"The rule that the benefits to the public must be direct and not remote and that the past course or usage of government is to be resorted to for guidance must in each case be considered in the light of the principle that the legislature has a very wide discretion to determine what constitutes a public purpose, and that courts will not interfere unless at first blush the act appears to be so obviously designed in all its principal parts to benefit private persons and so indirectly or remotely to affect the public interest that it constitutes the taking of property of the taxpayers for private use. It is to be observed that the tendency of later cases is toward greater liberality in characterizing taxes or appropriations as public in purpose." *State ex rel. Wisconsin Dev. Authority v. Dammann*, 228 Wis. 147, 182, 277 N.W. 278, 280 N.W. 698, 709 (1938).

[15] Petitioners make an elaborate argument that art. X of the Wisconsin Constitution raises to a constitutional status the complete fiscal autonomy of local school boards, such that all locally levied school taxes must be spent in the district, and no disincentives may be imposed by the state to limit the spending dis-

First, we note that the appropriate focus in testing whether the public purpose rule is violated is to look at the entire property tax and not merely the tax proceeds which must be paid to the state as negative aids. Under the new formula, the bulk of the funds raised by the local property taxes continues to be spent within the school districts in which they are raised.

Secondly, we must determine whether the negative aids formula in fact compels one school district to contribute to a purpose confined to another district. As this court asked: "Can the citizens of Dane County be thus compelled to contribute to any public purpose

cretion of local school boards. No cases are cited to support these sweeping propositions, and art. X clearly does not contain any such broad view of district fiscal autonomy. Art. X, sec. 4, provides that "each town and city shall be required to raise by tax, annually, for the support of common schools therein a sum not less than one-half the amount received by such town or city respectively for school purposes from the income of the school fund." The purpose of this section was to force the local units to support the schools, but only to the limits set forth therein. The section does not state that all taxes raised by the local unit must support common schools *therein*. Nor does art. X make education a local function. *See* text at notes 18–22, *infra*. Petitioner's arguments on this point are strained and artificial, and we conclude that they should be rejected.

For cases in other jurisdictions indicating that local governmental units do not have complete fiscal autonomy over taxes raised within the unit, *cf. School Dist. No. 12 v. Wasco Co.*, 270 Ore. 622, 529 P.2d 386 (1974) upholding ad valorem tax refunds to be paid by county though tax levied by and for benefit of single taxing district against contention of illegal imposition of burden on nonbenefitted districts; *Intermediate School Dist. No. 105 v. Yakima Co.*, 81 Wash.2d 443, 503 P.2d 104 (1972) upholding statute requiring Yakima County to make office space available without rent to school district encompassing more than Yakima County against contention of violation of constitution that county taxes be expended only for county purposes; *State ex rel. Woodahl v. Straub*, 164 Mont. 141, 520 P.2d 776 (1974) upholding distribution of state educational funds raised through

*confined* to the county of Marinette or St. Croix?"[16] We believe the legislature has reasonable grounds to conclude that contribution by a school district to the Department of Public Instruction of part of its locally raised property tax revenue which shall then be distributed as state educational aids to school districts, is in the interest of and is germane to the purposes of the contributing school district.[17] The taxpayers should not be heard to complain because a fraction of the taxes they pay for school purposes benefit the state's school system, of which the school districts in which they reside are a part.

School districts are merely quasi-municipal bodies and agents of the state for the purpose of administering the state's system of public education and have only such powers as are conferred upon them expressly or by necessary implication.[18] Public education is a state, not a

a general property tax against the contention that revenue must be expended in the county in which the revenue originates.

[16] *State ex rel. New Richmond v. Davidson,* 114 Wis. 563, 90 N.W. 1067 (1902). (Emphasis added.)

[17] Sec. 20.255 (1) (k), Stats., provides that the negative aid payments under sec. 121.08 (3) are appropriated to the Department of Public Instruction to be applied for the payment of educational aids under subchapter I of ch. 121, Stats.

[18] *Zawerschnik v. Joint County School Comm.,* 271 Wis. 416, 429, 73 N.W.2d 566 (1955); *Iverson v. Union Free High School Dist.,* 186 Wis. 342, 353, 202 N.W. 788 (1925); *State ex rel. Van Straten v. Milquet,* 180 Wis. 109, 113, 192 N.W. 392 (1923).

The respondent's brief notes that periodically the legislature has changed the boundaries of school districts, whereby territory from one district is detached and ordered attached to another district. Such orders have frequently been opposed on the grounds that the school district's valuation will decrease and that therefore their taxes will either increase or less money will be made available for education in that district. This court has rejected this argument holding that "whether the boundaries of a school district should be changed is not a question of law or fact for judicial determination, but is purely a question of policy, to be determined by the

local function, by virtue of the explicit command of the state constitution,[19] the express enactment of the legislature,[20] and the repeated pronouncements of this court over the years.[21]

It is true that school boards have a very large measure of local control, but it is the legislature, and not the constitution, which creates the specific dimensions of this local control.[22] Over the years the legislature has encouraged local control of the educational system. Nevertheless each local school unit is not an isolated entity unto itself. Each unit must meet state requirements and is subject to the supervision of the Department of Public Instruction. Each unit is part of the whole state educational system.

We believe it an inevitable conclusion that the purpose of each school district is not only to educate its own children but also to participate in a state-wide educational

legislative department. . . . The courts have nothing to do with the policy, wisdom . . . of such matters. . . ." *Zawerschnik v. Joint County School Committee, supra,* at p. 427. The state's conclusion that territorial changes and tax dollars being shifted, as in the case of negative aids, are comparable and are a constitutionally valid legislative function has merit.

[19] Art. X, sec. 1, Wis. Const., expressly provides that "[t]he supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law . . . ."

Art. X, sec. 3, Wis. Const., expressly provides that "[t]he legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable. . . ."

[20] Sec. 121.01, Stats., provides as follows: "It is declared to be the policy of this state that education is a state function. . . ."

[21] *State ex rel. Wisconsin Lutheran High School Conference v. Sinar,* 267 Wis. 91, 65 N.W.2d 43 (1954); *State ex rel. Thompson v. Giessel,* 265 Wis. 558, 61 N.W.2d 903 (1953); *State ex rel. Harbach v. Mayor,* 189 Wis. 84, 206 N.W. 210 (1926); *State ex rel. Dudgeon v. Levitan,* 181 Wis. 326, 193 N.W. 499 (1923).

[22] *See,* for example, ch. 120, Stats., which gives local school boards a wide measure of discretion in many fiscal and administrative matters.

system. Local school district purposes, for which local tax revenues may properly be spent, are not circumscribed by school district boundaries.

This was recognized as true of school districts in Ohio in *Miller v. Korns,* 107 Ohio St. 287, 140 N.E. 773 (1923). The statutes there involved had the effect of transferring a sizable portion of the property tax revenues of the school district in which the plaintiff resided out of that district for the benefit of other districts. A claim similar to that made here was raised:

"Plaintiff next contends that as the money raised in Silver Lake village school district is taken out of that district and used in other school districts in Summit county, it is employed for a purpose foreign to the school district of Silver Lake village, and hence for a purpose which is not legitimate in taxation." (p. 297)

In the course of rejecting this contention, the Ohio court said:

". . . Silver Lake village school district shares in the advantages which will be derived from uniform excellence of schooling in Summit county and in the state of Ohio. The state purpose of having efficient schools throughout the borders of Ohio is a purpose not foreign to Silver Lake village school district nor to any other school district, but is one which, seen in the proper light, belongs to every school subdivision in Ohio." (p. 299)

What was said of school districts in Ohio is equally true here.

Activities within a given school district are of interest and concern to and serve a purpose common to other districts. There is mobility of population and transfer of students; there is movement of children within the state and students attend school outside the school district of residence.[23] Moreover one school district may provide

---

[23] According to the Department of Public Instruction, during the school year 1974–1975, 29,085 students transferred from one

education of its pupils in another school district on a tuition basis. Sec. 120.13(4), Stats.

The legislature has created cooperative educational service agencies[24] and has divided the state into CESA

school district in Wisconsin to another. This figure does not include students who moved from one district to another during the summer recess. Milwaukee's experience is that a little less than one-half of the total number of students moving from one district to another make the move during the summer. Thus, one can estimate that approximately 50,000–55,000 students, out of a total school population of about 970,000, transferred from one Wisconsin school district to another in 1974–1975.

[24] Ch. 116, Stats. The Wisconsin Department of Public Instruction publication entitled *Wisconsin Cooperative Educational Service Agencies* describes CESA as follows:

"On July 1, 1965, Wisconsin's system of county superintendents of schools, elected by popular vote, came to an end. Successor to it in a redefined and altered role is a system of regional Cooperative Educational Service Agencies. . . .

"The geographical-political unit of responsibility for the county superintendency was the county. The agency's area of operational responsibility is a group of adjacent school districts, which in all cases embraces territory in two or more counties. At the time of their discontinuance there were 51 county offices in operation. The new regional agencies include all of the state's area in 19 units.

"For more than a century the county superintendent was a prominent figure in the affairs of Wisconsin Public Education. The statutes directed him to provide educational leadership, visit the schools, inquire into courses of study, keep informed in instructional procedures, advise school boards, advise teachers, certify valuation of school districts, make reports and investigations requested by the state superintendent and report the condition of the schools annually to the county board. Through the years a multitude of responsibilities associated with education and allied activities moved within the scope of the county office's activity, either by law, default or tradition.

". . .

"In reading the Wisconsin law which established the agencies, it seems reasonable to conclude that the rationale for agency existence and function assumes that there are services which are needed in the development of a complete educational program in a

territories, each of which is multi-county and embraces many school districts.[25] Each CESA is governed by a board of control consisting of up to eleven representatives of the school districts in the agency's territory. The legislature stated that such agencies are:

". . . designed to serve educational needs in all areas of Wisconsin and as a convenience for school districts in co-operatively providing to teachers, students, school boards, administrators and others, special educational services including, without limitation because of enumeration, such programs as research, special student classes, data collection, processing and dissemination, in-service programs and liaison between the state and local school districts."[26]

The board of control appoints an Agency School Committee within each agency territory. The Committee is given the responsibility of studying and evaluating the existing school district structure

". . . to determine if the goals of equal and improved educational opportunities for all children within the agency territory have been attained . . . and [to formulate] a plan to strengthen the administrative districts of the agency territory to operate a comprehensive school

---

local district which cannot be realistically supplied by the independent effort of that district. Therefore, to supply these services only as identified and authorized by the officials of school districts, a coordinating regional office is provided by the state.

"This intermediate unit thus places school district officials in Wisconsin in the position of looking at education not only in terms of their local district's program. They now find themselves involved with officials of other school districts in consideration of educational programs which transcend school district lines. Such activity could be interpreted as a regional approach to supplying the educational needs of children."

[25] For a map showing the geographical boundaries of each of the 19 Cooperative Educational Service Agencies and their office locations, see 1975 Blue Book, p. 417.

[26] Sec. 116.01, Stats.

program of offerings and services which meet the present and future educational needs of the children of the state and which can function with efficiency and at a justifiable cost to the local taxpayers and to the state."[27]

Sec. 20.255(1)(fc), Stats., provides state aids for the development of data processing services on a regional basis. Thus school districts are not isolated entities, either in terms of delivery of educational services therein or in terms of assessing the quality of performance in delivery of such services. An interdependency of purpose among school districts is implicit in the statutes dealing with education. Given these factors, it can hardly be said that a partial diversion of local tax revenues to the state for redistribution to other districts is constitutionally invalid.

Some might argue that the reasoning set forth above, pushed to its logical conclusion, means that every state benefit is of local concern and that any state direction for a local unit to turn over funds raised at the local level will therefore be valid. Such a conclusion does not necessarily follow from this opinion. In large part, it is the uniqueness of education among all public activities which supports this negative-aid system.

---

[27] Sec. 116. 51(2), Stats.